## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAILA MANSUR, Individually And On Behalf of All Others Similarly Situated,                 Plaintiff,<br><br>vs.<br><br>PARETEUM CORPORATION, ROBERT H. TURNER, DENIS MCCARTHY VICTOR BOZZO and EDWARD O'DONNELL<br><br>                Defendants | CIVIL ACTION NO. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

### INTRODUCTION

1.      This is a federal class action on behalf of purchasers of the common stock of Pareteum Corporation ("Pareteum" or the "Company") between **December 14, 2017 and October 21, 2019,** inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  As alleged herein, Defendants (defined *infra*) published a series of materially false and misleading statements that defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication, and that omitted to reveal material information necessary to make Defendants' statements, in light of such material omissions, not materially false and misleading.

### JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

1

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Pareteum maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff **LAILA MANSUR**, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Pareteum at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant **PARETEUM CORPORATION** is organized under the laws of the State of Delaware, and purports to maintain its principal place of business at 1185 Avenue of the Americas, 37th Floor, NY, NY. 10036.[1]   According to the Company's profile listed on *Yahoo.com/finance*, Pareteum operates a communications cloud services platform in Europe and internationally.  The Company was formerly known as Elephant Talk Communications Corp., and changed its name to Pareteum Corporation in November 2016.

---

[1] On September 6, 2017 Sichenzia Ross Ference Kesner LLP ("SRFK"), Pareteum's outside counsel, published a release announcing that it had relocated its headquarters to the **full floor at 1185 Avenue of the Americas, 37th Floor, New York, NY 10036**. It is unclear if Pareteum's operations are run out of its attorney's offices or if this is simply a mail-drop and service address, and no explanation has been provided by Pareteum.

8.    Defendant **ROBERT H. TURNER** ("Turner") is, and during the Class Period was, Principal Executive Officer (and/or Chief Executive Officer) and Executive Chairman of the Board of Directors of the Company.[2]  During the Class Period, Defendant Turner signed and/or certified the Company's Form 10-K and Form 10-Q filed with the SEC, and made materially false and misleading statements about Pareteum which he knew and/or recklessly disregarded were materially false and misleading, at that time.

9.    Defendant **EDWARD O'DONNELL** ("O'Donnell") is, and during the Class Period was, Chief Financial Officer of the Company.  During the Class Period, Defendant O'Donnell signed and/or certified the Company's Form 10-K and Form 10-Q filed with the SEC, and made materially false and misleading statements about Pareteum which he knew and/or recklessly disregarded were materially false and misleading, at that time.

10.    Defendant **VICTOR BOZZO** ("Bozzo") was during the Class Period, Chief Executive Officer of the Company, and is presently Chief Commercial Officer of the Company.[3]  During the Class Period, Defendant Bozzo signed the Company's Form 10-K filed with the SEC, and/or made materially false and misleading statements about Pareteum which he knew and/or recklessly disregarded were materially false and misleading, at that time.

11.    Defendant **DENIS MCCARTHY** ("McCarthy") is, and during the Class Period was, Chief Operating Officer of the Company, and may also be identified as President of the

---

[2] Effective May 24, 2019, the Company changed the titles of certain of its named executive officers "to better reflect their roles and responsibilities with the Company." No new employment agreements or arrangements were entered into between the Company and any of the named executive officers in connection with the title changes. Defendant Turner was appointed Chief Executive Officer and also remained the Company's Executive Chairman. Defendant Denis McCarthy was appointed Chief Operating Officer and resigned his position as President. Defendant Vic Bozzo was appointed Chief Commercial Officer and resigned his position as Chief Executive Officer. *See* Pareteum Corp., Current Report (Form 8-K) (May 24, 2019).

[3] *Id.*

Company.[4]   During the Class Period, Defendant McCarthy assisted in the preparation of the Company's SEC filings and/or made materially false and misleading statements about Pareteum which he knew and/or recklessly disregarded were materially false and misleading, at that time.

12.     The Defendants referenced above in ¶¶ 8 - 11 are referred to herein as the "Individual Defendants" and together with the Company may be collectively referred to as "Defendants."

13.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Pareteum's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

14.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Pareteum common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Pareteum's business, operations, management and the intrinsic value of Pareteum common stock; (ii) enabled defendants to

---

[4] *Id.*

4

artificially inflate the price of Pareteum shares; (iii) enabled Pareteum insiders to use at least $30 million of Company stock as currency to acquire revenues, and it enabled them to raise at least $50 million in capital necessary to fund operations, while in possession of material adverse non-public information about the Company; and (iv) caused Plaintiff and other members of the Class to purchase Pareteum common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Pareteum between **December 14, 2017 and October 21, 2019,** inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are the Individual Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Pareteum common shares were actively traded on the NYSE American until the market closed on October 22, 2018, and thereafter, beginning on October 23, 2018, the Company's common shares were traded on the Nasdaq.  As of March 18, 2019, there were 109.39 million shares of Company common stock issued and outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Pareteum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pareteum; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background to the Class Period / Relevant Corporate Background

21.     Pareteum was formerly known as Elephant Talk Communications, Corp., a declining international telecommunications software and services provider.  Beginning in November 2015 with the appointment of Defendant Turner as Executive Chairman, the Company underwent significant restructuring efforts, including its name change (to Pareteum), personnel and management changes including the appointment of Defendant Bozzo as Chief Executive Officer, and on February 27, 2017, a 1-for-25 reverse split of its common stock. Defendant Turner noted that the reverse stock split was intended to "[ensure] compliance with NYSE MKT minimum bid listing requirements"  while Defendant Bozzo added that the stock split "[would] demonstrate to the market, potential customers and empoloyees, that we have substantially completed our restructuring program and have built a business that can support long-term growth on a stable, solid foundation."

22.     Pareteum's Global Cloud Communications Platform software primarily targets mobile service and telecommunications providers, primarily Mobile Virtual Network Operators (MVNO). A MVNO provides wireless communications to customers; a MVNO does not own any network infrastructure so it rents bandwidth from large carriers like AT&T. Similarly, rather than develop its own software for operations and business support systems, MVNOs purchase those products from companies like Pareteum.

23.     Pareteum often uses and reports an internal metric, "36 Month Contract Revenue Backlog" (also referred to as "36MCRB," hereinafter "Backlog"), which the Company defines as follows:

> Contractual revenue backlog, a Non-GAAP measure is measured on a forward looking 36 month snapshot view monthly, and, is generated by each of the

Company's Managed Services, Global Mobility Cloud, and Application Exchange & Developer's Platform customers.

24.     The Company's market cap has grown from less than $20 million in December 2016 to as high as $569 million in May 2019, while its stock soared amidst a stream of over 200 press releases issued since the beginning of 2017 touting the Company's purported capabilities and growth.

25.     During the Class Period, the Company's reported revenues have grown rapidly, and in May 2019 the Company announced that its Backlog is approaching $1 billion.

### Undisclosed Biographies

26.     At no time during the Class Period did Pareteum disclose the complete backgrounds of certain officers, directors, managers, and significant investors of the Company, nor did Pareteum reveal allegations of fraud and stock manipulation by senior executives of the Company, including Defendants Turner and O'Donnell, and the connections of Pareteum and its senior managers and large investors with a notorious stock fraud pump-and-dump stock manipulator named Barry Honig ("Honig"), who has been a  target of actions and/or investigations by the SEC and the Department of Justice.[5]

27.     These willful non-disclosures also include Defendant O'Donnell's former association with AudioEye, Inc., where he was sued for booking phantom revenue in connection with that company's 92% revenue restatement.  Similarly, no disclosure was made regarding Defendants Turner and McCarthy's association with now worthless Catcher Holdings, Inc., another company with ties to Honig.

---

[5] On June 10, 2019, Honig entered a settlement with the SEC whereby he agreed to be banned from the business of investing in and financing publicly traded small cap companies.  This settlement was approved by U.S. District Court Judge Ramos on July 10, 2019.  This settlement stemmed from an action brought in September 2018 in the Southern District of New York against Honig for his role as the leader of a pump-and-dump securities fraud ring dating back to 2013.

(a)    Upon information and belief, Honig also has undisclosed ties to: 1) SRFK, which has served as legal counsel to Pareteum, and which has participated in other Honig-related companies; 2) Iroquois Capital and IntraCoastal Capital who regularly invest in companies owned by Honig and who, in March 2018, owned or controlled approximately 13.2% of the Company's outstanding shares; and 3) Dawson James who acted as placement agent in several Honig-related deals and who has acted as placement agent for Pareteum.

28.    These facts would only become known to investors in June of 2019, after two independent research groups published very critical reports on Pareteum, the dissemination of which caused the immediate decline in the price of the Company's stock.

**Material Weakness in Internal Controls & Procedures, and Financial Reporting**

29.    On March 18, 2019, Pareteum filed with the SEC its Form 10-K annual report for the year ended December 31, 2018 (hereinafter "2018 Form 10-K"), disclosing that throughout the Class Period there existed at Pareteum "material weaknesses in its internal control over financial reporting, [such that its] disclosure controls and procedures were not effective as of December 31, 2018."

30.    The 2018 Form 10-K states, in relevant part, that management had identified deficiencies that constitute material weaknesses in the Company's internal controls over financial reporting, including:

- Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment.

- Ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

31.    According to the 2018 Form 10-K, the material weakness, however, "did not result in any identified misstatements to the financial statements, and there were no changes to previously

released financial results."[6]  Thus, despite reporting the prior deficiency that purported to affect 2018 but not necessarily 2019, the 2018 Form 10-K also reported that there had been no changes in internal control over financial reporting.  As evidence of this, the 2018 Form 10-K stated, that:

> There have been no changes in our internal control over financial reporting during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

32.    The 2018 Form 10-K also purported to report that Pareteum's management had *already* been implementing and continued to implement "measures designed to ensure that control deficiencies contributing to the material weakness [were] remediated, such that these controls [were] designed, implemented and operating effectively[,]" within reason.  As evidence of this, Defendants represented that their actions would foreseeably "remediate the material weakness[,]" and that such remediation was foreseeably expected to be completed prior to the end of fiscal 2019.

33.    The material weakness inherent in the Company's internal controls and procedures (hereinafter "Controls and Procedures") that existed at Pareteum throughout the Class Period, only served to cause investors to rely more heavily upon Defendants to assure that the Company's financial statements were true, accurate, and reliable and that what Controls and Procedures did exist were at least minimally adequate to assure such transparency and reliability.  In fact, Defendants encouraged this reliance as evidenced by the Company's first quarter 2019 Form 10-Q, filed on May 10, 2019, in which Defendants stated that, "[i]n light of the material weakness described [in its SEC filings], we performed additional analysis and other post-closing procedures to ensure our financial statements are prepared in accordance with generally accepted accounting principles."

---

[6] Unless otherwise indicated, original source emphasis (bolding, underlines, and/or italics) has been removed, and all emphasis in this Complaint has been added by undersigned counsel.

**Defendants' Materially False and Misleading**
**Statements Made During the Class Period**

34.    The Class Period commences on December 14, 2017 and ends on October 21, 2019 when Pareteum published a press release announcing that "the Company will restate its previously issues consolidated financial statements as of and for the full year ended December 31, 2018, and interim periods ended March 31, 2019 and June 30, 2019." The Company's decision to restate these financial statements was "based on the Company's conclusion that certain revenues recognized during 2018 and 2019 should not have been recorded during that period . . . [because] the Company may have prematurely or inaccurately recognized revenue." As will be described more fully below, from December 14, 2017 through October 21, 2019, Defendants caused to be published and disseminated numerous press releases and/or SEC filings which contained materially false and misleading statements regarding the Company's revenue and customer growth.

35.    On December 14, 2017, the Company published a Shareholder Update Letter which stated, in part, that "[the Company's] restructuring and repositioning in 2016 has led to solid growth in 2017, and has defined our innovation in both services and market positioning, establishing a strong outlook for our success in 2018 and beyond[,]" and further thanked investors for their patience. This shareholder letter further provided that "*2017 Accomplishments Expected to Create Continued Growth and Market Innovations in 2018*" and that "*36 Month Contractual Revenue Backlog Grows to $129 Million at November 30, 2017.*" (italics in original, other emphasis added)

36.    Thereafter, on December 19, 2017, the Company published a press release announcing that on the prior day, December 18, 2017, the Company eliminated senior secured debt and "substantially improve[d] cashflow." This press release quoted Defendant Turner, in part:

"Our successful Debt repayment is one of the key elements of the corporate turnaround at Pareteum which began in Q4 2015. This debt financing package, originally implemented by the Company's former management, <u>was no longer optimized for the exciting value-generating and growth stage of our business plans</u>. We thank the Lenders for their support during the challenging restructure period. We also look forward to focusing on the <u>continued sales surge</u> by making investments in the business which <u>we expect to deliver maximum value for our equity investors</u>."

37.    Also, on December 19, 2017, the Company published a PowerPoint presentation, which provides that the company issued over $13 million in new 36 month contractual revenue Backlog and highlighted that the Company's "**[p]ath to profitability** is accelerated via **high margins** on subscribers and **the magic of monthly recurring revenue** will drive **sustainable returns**[.]" (Emphasis in original).

38.    Following these disclosures, Pareteum's shares traded as high as $1.96 per share and closed at $1.65 per share on December 19, 2017, a significant increase from its closing price of $0.72 per share on December 14, 2017, with higher trade volume on December 18, 2017 and December 19, 2017, as indicated in the following chart:



39.    On January 31, 2018, the Company published a press release announcing that it "Continues Momentum via Highly Successful January 2018" by adding $15,200,000 to its Backlog.  This press release provided, in part:

[D]uring the month of January 2018, the Company signed contracts scheduled to add $15,200,000 to its 36-month contractual revenue backlog. The current contractual revenue backlog represents a 400% increase from a year earlier and a 10% month over month increase to the $147,000,000 36-month contractual revenue backlog announced previously on January 3, 2018.

Pareteum's current cash balance is $15.6 million on January 31, 2018, reflecting having fully paid our senior secured loan, in the amount of $8.1 million, and, continuing the improved operations of the business. Increases in cash balances over prior periods are a result of net equity raised, warrant exercises and continued operational efficiencies. The improved strength of our balance sheet provides the foundation for Pareteum's focus on accelerated growth in 2018 and beyond.

Contracts executed in January 2018 that have meaningfully contributed to Pareteum's accelerating growth, as measured by our 36-month contractual revenue backlog, are:

• $1,000,000 contract from Social Media Provider to Enable Smartphone Services, announced January 4, 2018
• $5,400,000 contract from Pan European Mobile Operator with African Subscribers, announced January 10, 2018
• $3,000,000 contract from South America Data Network Provider to Add Mobility, announced January 17, 2018
• $1,000,000 contract from Brazil Mobile Service Provider, announced January 24, 2018
• $10,000,000 contract awarded to Pareteum Europe for MSP deployment to EMEA customer, announced January 26, 2018[.]

40.    This January 31, 2018 press release further quoted Defendant Turner: "Pareteum's performance is highlighted by the growth of our 36-month contractual revenue backlog, currently standing over $162,000,000, which represents a Compound Annual Growth Rate (CAGR), measured from the end of 2016's fourth quarter through 2017 of 400%! . . ."

41.    On February 12, 2018, Defendant Turner issued a letter to shareholders which stated, in part:

The TEUM of Pareteum Corporation continues to be hard at work, globally. We have had a <u>fast start to 2018 with excellent results in January</u> through the collective group initiatives of:

- Rob Mumby + his key sales executives and sales support TEUM;
- Ali Davachi + his key operations, technical support and service delivery TEUM;
- <u>[Defendant] Denis McCarthy</u> + his key corporate development TEUM;
- <u>[Defendant] Ted O'Donnell</u> + his accounting and finance TEUM
- And, as always, <u>[Defendant] Vic Bozzo</u> and his indomitable leadership, especially in the sales arena, to make things happen;

I am happy to report that our executive team, with its key leadership management team, is continuing to produce results. <u>We have a very big and bright 2018 planned. So far this year, in January alone, our TEUM signed $20.4 million of new contracts, spanning the globe, from Brazil to Africa to Europe. $15.2 million was additive to our now record high $162 million 36-month contractual revenue backlog</u>, as two of the awarded contracts are 5-year agreements. I am extremely proud of our TEUM's accomplishments as we have <u>accelerated the growth of our backlog from $60 million at June 30, 2017 to $162 million as of January 31, 2018. We expect the pace to accelerate during the year and that our reported results will reflect the hard work that has gone into the turnaround of our company</u>.

\* \* \*

We are proud to be debt-free with substantial cash to operate and grow our business. We are putting these dollars to work throughout 2018 (and beyond) in a manner that we believe will yield the maximum shareholder value to TEUM through:
- Profitable Sales growth
- Product and services development, with a detailed build or buy analysis applied

**<u>Pareteum continues to win new long-term contractual business at an unprecedented pace, as evidenced by our 36-month contractual revenue backlog</u>. <u>We expect this pace to increase throughout the year</u>**. . . .

42.    Included with the February 12, 2018 letter to shareholders was a link to a presentation which included the following graphic regarding the Company's Backlog as of January 31, 2018:



43.     Thereafter, on February 12, 2018, the Company published a press release announcing that "Pareteum (NYSEMKT:TEUM) is up 4.8% premarket following on a letter from its chairman outlining its start to 2018."

44.     On February 28, 2018, the Company published a press release announcing that it secured a "$10 Million Contract from Established Carrier to Launch Global MVNO" which would add to its Backlog. Defendant Bozzo was quoted as saying "[t]his contract is a major milestone for continued growth. Being awarded this contract demonstrates that the technology and strategy of Pareteum's turn-key solution for launching mobile network operators is being widely adopted across the globe."

45.     On February 28, 2018, Pareteum's common stock traded as high as $2.34 per share on volume of 5.12 million shares, up from the prior day's close of $2.00 per share and 647.9k share volume.

46.     On March 21, 2018, the Company published a press release announcing that it added $10 million to its Backlog via a contract with an Africa-based MVNO. Defendant Bozzo

15

stated: "Pareteum's MSP Platform is a perfect fit for the contract with our newest global client. This part of the world represents high growth in connections as the digital economy takes over. <u>We are pleased with Rob Mumby and his team as they continue to add customers to our platform</u>."

47.    On March 21, 2018, Pareteum's stock traded as high as $3.35 per share with 11.08 million share trading volume, up from the prior day's close of $2.85 per share.

48.    On April 9, 2018, the Company published a press release announcing that "[First Quarter] 2018 Revenue Expected At $4.1 Million, a 47% Increase over [First Quarter] 2017." Specifically, the press release stated that "the Company expects to report revenues of at least $4.1 million, which represents 47% growth for the first quarter ended March 31, 2018," and quoted Defendant Turner:

> "Our TEUM ended the 2017 year with a very strong fourth quarter as demonstrated by the acceleration in revenues. This momentum led to a robust first quarter of 2018 with continued year-over-year growth expected throughout the year. This momentum is a result of our success in converting our contract revenue backlog into connections which generates revenues."

49.    On May 7, 2018, the Company published a press release announcing "record" results for the first quarter 2018, for the period ending March 31, 2018.  Therein, the Company reported "Revenues of $4.113 Million, up 47% Year-Over-Year," noting, in part, the following "Key Business Highlights for First Quarter 2018:"

- Awarded 14 contracts aggregating to $60 million in total contract value, which added $53 million to 36-month contractual revenue backlog
- Increased 36-month contractual revenue backlog from $147 million at 12/31/17 to $200 million
- Backlog revenue conversion at 103%
- Ended Q1 2018 with 2,200,000 connections, a lead indicator of revenue, increased 94% versus the end of the first quarter 2017 and 30% from the sequential fourth quarter of 2017, with an additional conversion increase of 70% versus the expected in the 36-month contract backlog for connections

50.    This May 7, 2018 press release quoted Defendant Turner as follows:

This quarter represents a record quarterly revenue milestone since we executed our turnaround and transformed the business in 2016. I am also extremely pleased and proud to report that we generated positive operating cash flow in the first quarter, a full quarter earlier than expected. First quarter revenue would have been $4.22 million, but we instituted Accounting Standard for Revenue Recognition (606) for our SaaS business model and did not recognize $107,000 of deferred revenue in the first quarter. All of our profitability metrics improved dramatically; Adjusted EBITDA, EBITDA, operating loss and cash flow from operations. Key performance indicators of connections, backlog conversion, connection values, revenue per employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution. We also invested in product development and sales and marketing during the quarter, as we prepare to scale our business for expected growth and profitability. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value[.]

51.     This May 7, 2018 press release further provided that "[b]ased on our 36-month contractual revenue backlog of $200 million, as of March 31, 2018, and 2,200,000 connections, we are raising our 2018 outlook. The Company now expects 2018 revenue growth of at least 60% over 2017, up from the previous provided guidance of 50%."

52.     On May 11, 2018, Pareteum filed with the SEC a Form 10-Q quarterly report for the first quarter ended March 31, 2018, which was signed and certified by Defendants Turner and O'Donnell.  In addition to making substantially similar materially false and misleading statements concerning Pareteum's revenues and customer growth as had been published previously, the May 11, 2018 Form 10-Q made the following statements regarding the Company's Controls and Procedures:

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

As of March 31, 2018, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Principal Executive Officer and Principal Financial and Accounting Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. Based on the evaluation, the Company's

Principal Executive Officer and Principal Accounting Officer have concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Control Over Financial Reporting*

On January 1, 2018, the Company adopted ASC Topic 606, "Revenue from Contracts with Customers" and other than this change and related update to the Company's internal controls, there have been no additional changes in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended March 31, 2018 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

(emphasis of headings in original).

53.    The May 11, 2018 10-Q also purported to report the Company's "Basis of Presentation of Interim Periods" in part, as follows:

The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation S-X. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three months ended March 31, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

54.    In addition to the foregoing, the Company's May 11, 2018 Form 10-Q contained certifications, pursuant to 18 U.S.C. section 906 of the Sarbanes-Oxley Act of 2002 (hereinafter

"SOX"), signed by Defendants Turner and O'Donnell that purported to attest to the accuracy and completeness of Pareteum's financial and operational results.

55.    As further outlined in ¶¶ 132-160 *infra*, the statements made by Defendants, and contained in the Company's December 14, 2017, December 19, 2017, January 31, 2018, February 12, 2018, February 28, 2018, March 21, 2018, April 8, 2018, May 7, 2018, and May 11, 2018 press releases, publications, and/or filings with the SEC, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the following reasons, among others:

(a)    At all times during the Class Period, it was not true that the Company's purported success was the result of hyper-demand for Pareteum's unique products or exceptional service, or the Company's competent management; but, in fact, throughout the Class Period, Defendants had propped up the Company's results by manipulating Pareteum's accounting for revenues, income, and the important Backlog metric;

(b)    At all times during the Class Period, unbeknownst to investors, Defendants had materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results;

(c)    Throughout the Class Period, it was also not true that Pareteum contained even the most minimally adequate systems of internal operational or financial controls, necessary to assure that Pareteum's reported financial statements were true, accurate, and/or reliable;

(d)    As a result of the foregoing, throughout the Class Period it also was not true that the Company's financial statements and reports were prepared in accordance with GAAP and SEC rules; and

(e)    As a result of the aforementioned adverse conditions which Defendants failed to disclose, throughout the Class Period, Defendants lacked any reasonable basis to claim that Pareteum was operating according to plan, or that Pareteum could achieve the guidance sponsored and/or endorsed by Defendants.

56.    As previously described above in ¶¶ 26-28, Pareteum also failed to disclose complete and relevant backgrounds of Company executives, including but not limited to allegations of fraud and stock manipulation and numerous connections of Pareteum, its senior managers, and large investors with a notorious stock fraud pump-and-dump stock manipulator Honig.

57.    On July 10, 2018, Pareteum published a press release announcing

[T]hat the Company expects to report revenues of at least $5.75 million which represents approximately 78% growth for the second quarter ended June 30, 2018, as compared to a year ago. The second quarter's expected 2018 revenues will represent an approximate 40% sequential growth over the first quarter of 2018, demonstrating the strong growth in connections that was previously reported in the first quarter of 2018.

In connection with this press release, Defendant Turner was quoted:

[We] surged into 2018 with strong first quarter results, demonstrated by the acceleration in revenues and connections. This momentum has continued into the second quarter, at an accelerating rate, because of rapid conversions of our 36 Month Contractual Revenue Backlog. We see this translating into our best quarter, ever. We anticipate continued improvement in our results and execution of our long-term strategies, aimed at open mobility and open applications, globally delivered as part of excellent customer experiences in every engagement.

58.    On August 6, 2018, Pareteum published a press release announcing "Record Second Quarter 2018 Results" as follows:

**Key Financial Highlights for Second Quarter 2018 Year over Year:**

- Revenues increased by 85% to $6 million

* * *

**Key Business Highlights for Second Quarter 2018:**

- Awarded 13 contracts aggregating to $55 million in total contract value, which added $55 million to 36-month Contractual Revenue Backlog
- Increased 36-month Contractual Revenue Backlog from $200 million at End of the first quarter of 2018 to $276 million; includes $21 million incremental from existing contracts
- Contractual Revenue Backlog conversion rate at 106%
- Ended the second quarter of 2018 with 2,713,600 Connections, an increase of 225% over the end of the second quarter of 2017 and 23% higher than the first quarter of 2018

(bolded headings in original). This August 6, 2018 press release quoted Defendant Turner as follows:

> The quarter ended June 30, 2018, marks the achievement of materially significant milestones for Pareteum as it continues to evolve into a high-growth, software-based, enabling cloud services company. Our results include attainment of positive Net Income and positive EBITDA for the first time in Company history. Surpassing $6 million in revenues in the second quarter demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue. Today we operate with our Global Enablement Cloud, fueled by the award winning, and, customer affirmed, software applications, solutions and application programming interfaces (APIs). It is this combination that is making our services and software the developer community's first choice for connectivity and communications. We generated positive EBITDA and Net Income, validating the efficient scalability of our business. We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line. Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values, revenue-per-employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value[.]

59.    On August 13, 2018, Pareteum filed with the SEC a Form 10-Q quarterly report for the 2018 second quarter ended June 30, 2018, wherein it reported unaudited revenues of $6,003,180 for the quarter, representing an 85% increase compared to $3,239,175 for the same period ended June 30, 2017.  This Form 10-Q also purported to report the Company's "Basis of Presentation of Interim Periods" in part, as follows:

The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation S-X. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three and six months ended June 30, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

60.     In addition to signing the August 13, 2018 Form 10-Q, Defendants Turner and O'Donnell also signed SOX Certifications, in which they purported to certify and attest to the truth, accuracy, and completeness of the quarterly report.

61.     For the reasons stated in ¶¶ 55-56 *supra*, and as further detailed in ¶¶ 132-160 *infra*, the statements made by Defendants, and contained in the Company's July 10, 2018 and August 6, 2018 press releases, and the Company's August 13, 2018 Form 10-Q quarterly report filed with the SEC, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time.

62.     On October 5, 2018, Pareteum published a press release announcing that the Company expected "a minimum of $8 million in third quarter revenues" which "represent[ed] an approximate 129% growth for the third quarter ended September 30, 2018, as compared to a year ago . . . [and] an approximate 33% sequential growth over the second quarter of 2018, demonstrating the continuing strong increase in connections previously reported in the second quarter of 2018."

63.    In the October 5, 2018 press release, Defendant Turner was quoted as follows:

Pareteum continues to surge through 2018; with our expectation of superior financial and operating results for the third quarter. Our acceleration in revenues and connections proves it, and there's more to come. We are focused on forward momentum, and it is happening as we move into the fourth quarter. Why? Because our existing customers are buying more from us and we are signing on new ones. This sales performance, coupled with our daily-accelerating 36-Month Contractual Revenue Backlog conversion, provides a favorable outlook for our business, even before we complete the operational integration of our newly-acquired Artilium, which is also performing well. We are in a good place for our company.

64.    On October 24, 2018, Pareteum published a press release announcing that the Company had grown its Backlog to $500 million, which "include[d] the backlog incorporated with Pareteum's recent acquisition of Artilium and excludes certain monthly recurring revenue streams deriving from that acquisition for which long-term contracts are not in place." The press release noted that this Backlog milestone represented "a 1,150% increase year over year since 2016: at year end 2016, Pareteum announced $40 million 36MCRB; at year end 2017, the company announced $147 million; and now, ten months into this year, Pareteum has reached $500 million in 36MCRB." The Company further noted that "[d]uring the same period, Pareteum's quarterly booked revenue increased by 260%."

65.    On November 7, 2018, Pareteum published a press release announcing "Record Third Quarter 2018 Results" as follows:

- Revenues of $8 Million, up 129% Year-Over-Year
- Adjusted EBITDA of $1.8 Million
- Non-GAAP EPS of $0.01
- Raised 2018 Outlook to 100% Revenue Growth
- Dollar-Based Net Expansion Rate of 147%

* * *

**Key Financial Highlights for Third Quarter 2018 Year over Year:**
- Revenues increased by 129% to $8 million
- Adjusted EBITDA improved by over $1.2 million, or 195%, to $1.8 million

- Non-GAAP Earnings Per Common Share improved to $0.01 for Q3 2018, compared to ($0.12) for Q3 2017
- Increase in total assets from $10 million to $35 million
- Cash balance of $18.9 million
- Dollar-based expansion rate where customers of record in 2017 have grown their revenue dollar spending by 147% in the third quarter of 2018 versus the third quarter of 2017

**Key Business Highlights for Third Quarter 2018:**
- Awarded 19 contracts aggregating to $403 million in total contract value, which added $127 million to 36-month Contractual Revenue Backlog
- Increased 36-Month Contractual Revenue Backlog from $276 million at end of the second quarter of 2018 to $403 million; includes $72 million incremental from existing contracts
- Contractual Revenue Backlog conversion rate at 100%
- Ended the third quarter of 2018 with 2,903,000 Connections, an increase of 127% over the end of the third quarter of 2017 and 7% higher than the second quarter of 2018

(bolded headings in original).

66.    This November 7, 2018 press release quoted Defendant Turner as follows:

The quarter ended September 30, 2018, marks our continued evolution into a high-growth, software-based, enabling cloud services company. Surpassing $8 million in revenues in the third quarter demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue. Our results include growth in adjusted EBITDA, which reflects the scalability of our recurring revenue SaaS business model. Subsequent to the end of the third quarter, we closed the Artilium acquisition and have been busy integrating and streamlining the businesses and eliminating redundant expenses. We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line. Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values, revenue-per-employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value[.]

67.    On November 14, 2018, Pareteum filed with the SEC a Form 10-Q quarterly report for the third quarter ended September 30, 2018, wherein it reported unaudited revenues of $8,007,734 for the quarter, representing a 129% increase compared to $3,498,688 for the same

period ended September 30, 2017. This Form 10-Q also purported to report the Company's "Basis

of Presentation of Interim Periods" in part, as follows:

> The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation S-X. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

> The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three and nine months ended September 30, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

68.    In addition to signing the November 14, 2018 Form 10-Q, Defendants Turner and

O'Donnell also signed SOX Certifications, in which they purported to certify and attest to the

truth, accuracy, and completeness of the quarterly report.

69.    For the reasons stated in ¶¶ 55-56 *supra*, and as further detailed in ¶¶ 132-160 *infra*,

the statements made by Defendants, and contained in the Company's October 5, 2018, October

24, 2018, and November 7, 2018 press releases, and the Company's November 14, 2018 Form 10-

Q quarterly report filed with the SEC, were each materially false and misleading when made, and

were known by Defendants to be false or were recklessly disregarded as such thereby, at that time.

70.    On February 12, 2019, Pareteum closed the tender and exchange offer to complete

the acquisition of an entity called iPass Inc. (Nasdaq: IPAS) ("iPass") in a stock-based acquisition

valued at approximately $30 million. The following day, February 13, 2019, the Company

published a press release announcing the acquisition and reporting that it had accepted for

exchange all shares of iPass, validly tendered in exchange for 1.17 shares of Pareteum common stock for each share of iPass. The shares accepted represented approximately 66.78% of iPass's outstanding shares of common stock.[7] The $30 million stock-based acquisition of iPass by Pareteum was effectuated by a Prospectus filed with the SEC on February 13, 2019.

71.    In connection with the acquisition, Pareteum issued 9.865 million shares of common stock to shareholders and 705,000 shares were granted to employees. The allocation of the purchase price was as follows:

| | |
|---|---|
| Shares issued to shareholders | $ 29,253,000 |
| Shares issued to employees | $ 1,401,000 |
| **Total purchase consideration** | **$ 30,654,000** |

72.    The February 13, 2019 press release quoted Defendant Turner, in part, as follows:

"We're delighted to announce the completion of our acquisition of iPass. **We will now accelerate as one company with combined software products and services, the expansion of addressable markets** and the resulting executive and operating talent. Our integration with iPass immediately grows our installed Connections base, adding marquee brands to our portfolio of customers, and it also materially enhances our software portfolio of services, and adds global access to the world's largest Wi-Fi network."

73.    The following day, February 14, 2019, the Company published a press release that purported to announce that Pareteum grew "FY2018 36 Month Contract Revenue Backlog to $615M," and that "sales surge yields $15 million in new contracts in the final two weeks of the year[.]" This press release also stated, in part, the following:

[Pareteum] a rapidly growing global cloud software communications platform company with a mission to connect "every person and every(thing)", today announced that it closed FY2018 with six new three-year agreements with new and existing customers, worth a total of $15 million. Combined with previously

---

[7] According to the press release, Pareteum acquired the remaining outstanding shares of iPass's common stock through a merger of a wholly-owned subsidiary of Pareteum with and into iPass immediately following expiration of the tender offer and acceptance of the iPass shares on February 12, 2019. Following the transaction, iPass shares ceased trading on Nasdaq.

announced contracts, Pareteum's 36-month contractual revenue backlog now totals $615 million. In addition, eight agreements that were announced in November and early December have been launched into production.

74.    This press release quoted Defendant Turner, in part, as follows:

As demonstrated with our new clients, Pareteum is starting 2019 stronger than ever, growing and satisfying our customers' needs, innovating at a relentless pace ahead of others. We are in the business of inspiring and growing towards the future, **operating profitably**, and recognizing and believing that 'we are all in sales'.

This press release also quoted Rob Mumby, Pareteum's Chief Revenue Officer, who also stated,

in part, the following:

"Our strong position at the end of 2018 is exceeded by further strong growth into 2019 and indicates the scale of opportunities open to Pareteum. We continue to have a strong focus on sales and our service delivery as we launched eight customers in December. We have never been better positioned to empower businesses with the latest connectivity and cloud platform mobility solutions[.]"

75.    On February 14, 2019, Iroquois Capital Management, LLC (theretofore the owner

of over 3.575 million Pareteum shares) reported that it had liquidated 100% of its Pareteum

holdings, presumably within the prior 10 day reporting period.[8]  Following this report, on February

15, 2019, shares of the Company traded over $3.75 per share, up from its closing price of $3.19

per share on February 14, 2019.

76.    Thereafter, on February 15, 2019, Pareteum published a press release that purported

to announce that "Sales Momentum [brought] $49 million in 36 Month Contract Revenue

Backlog."  This press release stated, in part, the following:

[Pareteum] a rapidly growing global cloud software communications platform company with a mission to connect "every person and every(thing)", today announced that it closed twelve agreements in January including new customers as well as upselling to our existing customers.

---

[8] According to a Schedule 13G filed with the SEC on December 8, 2017, it appears that Iroquois Capital Management acquired the 3.575 million shares within 10 days of that time. On February 8, 2019, Intracoastal Capital, LLC also filed an Amendment No. 1 to Schedule13G, evidencing its liquidation of Pareteum stock.  Previously, Intracoastal had reported that it too had an interest in 3,575,573 shares issuable upon exercise of a warrant.

77.    This press release again quoted Defendant Turner, in part, as follows:

"We love our customers, whether they are simply buying more from us or are new customer relationships deriving value from the significant savings and new revenues we help them generate. These new January agreements reinforce how easy it is to do business with [Pareteum] and is yet another step in our mission to connect every person and "every(thing)" through open mobility and applications everywhere."

This release also quoted Rob Mumby, Pareteum Chief Revenue Officer, who stated that:

"Pareteum is experiencing great success with developers and enterprises for our cloud software solutions[.] . . .With the addition of these new agreements, we're confident we will continue accelerating our growth as the market's first choice for cloud software communications solutions, expanding our ever growing reach, empowering businesses worldwide."

78.    On February 20, 2019, Pareteum published another press release that purported to announce it had launched "Six Customer Agreements into Production in January." This press release quoted Defendants Bozzo and Turner, as follows:

"We continue to move signed customers from our contract backlog into production and revenue generation mode, delivering immediate value," said [defendant] Bozzo[.] . . .

[Defendant] Turner comments, "We are rapidly bringing our customers into service production, enabling them to realize their business plans, creating unique mobility and application software solutions. The ability to quickly accomplish all this, without heavy infrastructure or software development cost, keeps our customers coming back for more."

79.    On February 26, 2019, with share prices trading almost 25% higher since the announcement of the closing of the iPass acquisition, taking advantage of the artificial inflation in the Company's stock price that the publication of their materially false and misleading statements had caused, Defendants published a press release announcing that they had secured an additional $50 million credit facility with lender, Post Road Group (hereinafter "Credit Facility"). This press

release disclosed that approximately $11 million of the initial draw was to be used to repay debt

from Fortress Credit Corp. which had been assumed by the Company in the iPass transaction.[9]

80.     This press release again quoted Defendant Turner, who stated the following:

"During 2018, we showed our ability to convert our contractual revenue backlog into tangible results. This financing gives us a new currency with which to support our aggressive market consolidation through accretive acquisitions and organic growth strategy and **improves leverage in the business to respect the value that management places on equity. The facility will allow us to continue on our current growth trajectory in 2019 and the future**."

This press release further provided:

The credit facility was led by Post Road Group and is a milestone transaction for Pareteum's mission to connect every person and every(thing)™. The credit facility provides financing secured through Pareteum's existing recurring revenue streams from its software as a service platform, as well as its growing intellectual property portfolio. **The transaction enables Pareteum to continue to demonstrate its ability to grow revenues on an organic as well as inorganic basis, globally**.

81.     This press release also quoted Michael Bogdan, Managing Partner of Post Road

Group, who added: "[t]he strength of Pareteum's combined capabilities after its recent acquisitions

creates a company with significant scale and international presence to drive further consolidation

in this industry."  Little did Mr. Bogdan know — but as he would soon discover — Pareteum was

in default on the terms of this Credit Facility from the moment it was signed, and within less than

a month's time would not even continue to make interest payments, much less secure certain

consent agreements necessary before the Company could access half of the $50 million.  While

Mr. Bogdan was quoted as stating that "[w]e are excited to become Pareteum's capital partners . .

." this excitement would quickly turn into frustration.

---

[9] Additional terms of the Credit Facility were only disclosed in Pareteum's Form 8-K filed on February 26, 2019. Among other things, these terms and conditions included: (i) obtaining the consents of certain third-parties prior to any additional loans beyond the initial $25 million; (ii) specified levels with respect to operational and financial covenants; and (iii) requirement to maintain a minimum of $2 million of unrestricted cash, maximum leverage ratios, churn rate and adjusted EBITDA.

82.     For the reasons stated in ¶¶ 55-56 *supra*, and as further detailed in ¶¶ 132-160 *infra*, the statements made by Defendants, and contained in the Company's February 13, 2019, February 14, 2019, February 15, 2019, February 20, 2019, and February 26, 2019 press releases, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time.

83.     In addition to the foregoing and as investors would learn in late-August 2019 when Defendants filed for a credit waiver and revealed Pareteum would have to pay Post Road Group 750,000 additional shares of common stock, thereby diluting investors' ownership of the Company, at that time the Company was in default of the February 2019 Credit Facility:

(a)     The Company failed to make even its initial interest payments;

(b)     The Company failed to fulfill it reporting obligations to Post Road Group;

(c)     The Company was unable to obtain and timely deliver the two consent agreements required by the Credit Facility.

As such, the Company was in default and at no time could it access any additional funds. Accordingly, it was also materially false and misleading to represent to investors that the remainder of the $50 million available thereunder would be available, when Defendants knew or recklessly disregarded that it foreseeably would not.

84.     On February 28, 2019, Pareteum published a press release that announced Defendant McCarthy would appear for one-on-one meetings on March 19th, at the Roth Capital 31st Annual Growth Conference, taking place at the Ritz Carlton Hotel in Laguna Niguel, California.

85.    On March 5, 2019, Pareteum issued another press release purporting to announce big contract wins, with at least <u>20 new customers amounting to $30 million in that one month</u>. This press release quoted Defendants Bozzo and Turner, as follows:

> [Defendant] Turner commented: "<u>These new customers have chosen Pareteum because we solve real problems and add immediate value to their operations</u>. This is our "Power of ONE TEUM" – <u>by bringing together Pareteum, Artilium, and iPass, we are delivering innovative, easy to use products and services that are the leading edge of this industry</u>. This is how we "reimagine communications" everyday. It is our customers, who have been with us for years and continue to buy more services from us, coupled with our newest relationships, who have benefited most from TEUM's growing market momentum and have contributed to our ever expanding service reputation for quality and dependability."

> [Defendant] Bozzo . . . , added: "<u>Our plan to establish Pareteum as the leader in communications services is progressing well.</u> We are very pleased with the traction over the last month and the growing list of customers who are choosing to partner with Pareteum to deliver innovative communications services."

86.    In anticipation of the Company's March 12, 2019 Fourth Quarter and Full Year 2018 Earnings Call, on March 7, 2019, Defendant Turner published a Chairman's Letter to Shareholders, which stated, in part, the following:

**Dear Fellow Shareholders,**

In September 2018 I wrote a THANK YOU to you for your demonstrable support of Pareteum as you approved the Artilium acquisition. At that time, it was clear that you provided your support to us which in turn affirmed **our clear mandate to hyper-accelerate growth in accretive ways, be it through our continued stellar sales growth, or, through additional successful strategic alliances** which is how we began our Artilium acquisition. We certainly expect to continue our market disruption, using our software to fuel our ambitions, business plans and strategies.

\* \* \*

Looking forward, we are a company with ambitious plans for continued growth and profitability. On our upcoming earnings call, scheduled for March 12, 2019, you will hear about our 2018 successes that have laid a strong foundation as we set even more challenging 2019 goals. Our growth will continue from our current customers who continue to buy more from us. <u>We will also see many new customers enter our client rosters, and because of our iPass acquisition, we have opened completely new market</u>

segments in the enterprise sector. <u>We fully expect to be the market leader in cloud based communications software as a service, as we execute on our business plan.</u>

87.    Defendant Turner used the March 5, 2019 press release to condition investors to believe, in part, the following:

We have been updating you on our progress through our recent press releases, which we will continue to do. As **<u>we maintain our laser focus on growth</u>** . . .

<u>We are well positioned now to drive dramatic increases in our scale and become the recognized market leader through the value we create</u> for our customers and shareholders. We expect to continue to attract long-term institutional investors who believe in our proven ability to execute our plans and scale the company. Additionally, you will have read that **<u>we have improved our capital gain plans</u>** by the addition of a <u>$50 million debt facility, initially being used to fully repay iPass' approximately $11 million debt on better terms, and which puts us in a position to act immediately when accretive opportunities, that further improve Pareteum, are identified</u>. We also believe that leveraging our business in this way <u>demonstrates management's confidence in our business and equity value.</u>

As you have heard me say many times, "<u>we are all in sales!" We are driving hard, everyday to acquire new customers, upsell our existing customers and aggressively convert our 36MCRB</u>.

88.    On March 12, 2019, Defendants published a press release that purported to announce the Company's results for the fourth quarter of 2018 and 2018 fiscal year, for the period ended December 31, 2018.  This release stated, in part:

*Q4 Revenue Growth of 256% and FY 139%*
*Q4 Adjusted EBITDA of $2.34M and FY $6.4M*
*Q4 Non-GAAP EPS of $0.02 cents and FY $0.09 cents*
*Net Dollar-Based Expansion Rate of 214% Year-Over-Year*
*Announces 2019 Guidance – Projecting 225-260% Year-Over-Year Revenue Growth*

* * *

**FOURTH QUARTER 2018 FINANCIAL RESULTS:**
**(Unless otherwise noted, all comparisons are made to the fourth quarter of 2017)**

- <u>Total revenues increased 256%</u> to $14.3 million

- In December of 2018 our Global Software Defined Cloud (GSDC) revenue was 51% of our total revenue, with 35% in Managed Services (MSP) revenues, and Super API of 14%
- Adjusted EBITDA increased 82% to $2.34 million
- Non-GAAP EPS of $0.02 cents
- Artilium financials are fully consolidated and accretive in Pareteum's fourth quarter results

**FULL YEAR 2018 FINANCIAL RESULTS:**
**(Unless otherwise noted, all comparisons are made to full year of 2017)**

- Revenues increased 139% to $32.4 million
- Adjusted EBITDA improved 199% year-over-year to $6.4 million
- Non-GAAP EPS of $0.09 cents compared to $0.05 cents for year ending 2017
- We ended the year with a $6.1 million cash balance and no secured debt

**KEY 2018 OPERATIONAL METRICS:**

- 36-month Contractual Revenue Backlog quadrupled to $615 million for the full year 2018, up from $147 million in 2017 with a conversion rate to revenue of 100%
- Connections increased 252% to 4,609,000 for the full year 2018, and grew 59% sequentially in the fourth quarter of 2018
- Fourth quarter average annualized revenue per employee of $415,000, an improvement of 78% year-over-year

| ($000's) | Sequential Quarterly Key Metrics | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Q4 2017 | | Q1 2018 | | Q2 2018 | | Q3 2018 | | Q4 2018 |
| REVENUE | 4,015 | | 4,113 | | 6,003 | | 8,008 | | 14,312 |
| YEAR-OVER-YEAR REVENUE GROWTH | 870 | 28% | 1,318 | 47% | 2,764 | 85% | 4,509 | 129% | 10,297 | 256% |
| GROSS MARGIN | 2,910 | 73% | 2,918 | 71% | 4,223 | 70% | 5,879 | 73% | 9,085 | 63% |
| ADJUSTED EBITDA | 1,283 | | 283 | | 1,297 | | 1,782 | | 2,339 |
| EBITDA | (2,733) | | (869) | | 597 | | (5,851) | | (3,093) |
| CASH BALANCE | 13,538 | | 15,759 | | 19,205 | | 18,865 | | 6,052 |
| 36 MONTH CONTRACTUAL REVENUE BACKLOG | 147,000 | | 200,000 | | 276,000 | | 403,000 | | 615,000 |
| CONNECTIONS | 1,310 | | 2,220 | | 2,714 | | 2,903 | | 4,609 |

(italics and bolding in original).

89.    This press release again quoted Defendant Turner, in part, as follows:

2018 was a record year for Pareteum, achieving over 139% year-over-year revenue growth driven by the effectiveness of our cloud-based platform, innovative product solutions, employee talent and leading customers. In fourth quarter of 2018, we reported 256% year-over-year revenue growth, which included the first full quarter

of our accretive Artilium acquisition. We are extremely pleased with <u>Pareteum's significant results in 2018 which are attributed to our TEUM's laser focus on sales expansion and operational improvements</u>. Looking ahead to 2019, we are very excited about the tremendous opportunities for Pareteum <u>given the strong industry dynamics; our visibility into future revenue from our 36 Month Contractual Revenue Backlog; and, the augmented talent, product, services, network expansion and productivity improvements implicit from our strategic acquisitions</u>.

90.     Regarding purported "RECENT BUSINESS HIGHLIGHTS", Defendants reported that an "initial draw" of $25 million of the $50 million Credit Facility would be used, as follows:

- The Company closed a $50M credit facility with Post Road Group in February 2019. **<u>An initial draw of $25M will be used to repay the debt and transaction costs associated with the iPass transaction and to facilitate accelerated organic growth and potential M&A transactions</u>**.

91.     Regarding 2019 Full Year Guidance, the March 12, 2019 press release forecast wildly-accelerating **<u>growth in the range of 225 – 260% year-over-year</u>**, as follows:

**<u>We expect revenue to be between $105 million and $115 million for the full year of 2019</u>**. Adjusted EBITDA and Cash Flow, net of restructuring and acquisition costs will be positive for the year.

We are expecting 2019 revenue **<u>growth in the range of 225% to 260% year-over-year</u>**, outpacing the market growth rate fivefold to be updated quarterly.

92.     Later the same day, on March 12, 2019, Defendants hosted an earnings call with analysts and investors during which they reiterated many of the same materially false and misleading statements as had been made previously in press releases and SEC filings. In addition, Defendant Turner used this opportunity to condition the market to believe, in part, that:

Pareteum delivered <u>excellent results in 2018 as well as in the fourth quarter of 2018. Pareteum's prospects are now the very best, more than ever before in our history. There is a clear path ahead for dramatic revenue growth and this is fueled by the growth of our 36 Month Contractual Revenue Backlog and its conversion of that backlog into billing customers</u>. Artilium, which we acquired in October of 2018, has performed extraordinarily well. Bart, I want to thank you and all of our new Artilium teammates for that. Artilium was accretive to earnings and revenue just as we said that it would be. Well done, Bart and team.

34

Since our acquisition of iPass closed just a few weeks ago, many good things have happened. We've got newly -- new high experienced teammates joining with their extremely solid business acumen, their operating muscle, and importantly, we see that our new teammates are <u>highly energized by the significantly expanded prospects that come with their being part of Pareteum</u>.

* * *

For the remainder of 2019, we have a current robust pipeline of another 29 prospective sales transactions, and that's what's been identified just through mid-March. <u>Pareteum's potential addition to our 36-month contractual revenue from these identified customers in our pipeline is currently $166 million</u>.

93.    In addition to the foregoing, during the same March 12, 2019, earnings call, Defendant McCarthy (identified in the transcript as Pareteum President), also stated, in part, that:

We generated $14.3 million of revenue in the fourth quarter and <u>our gross margins were 63%, in line with expectations post the Artilium acquisition</u>.

* * *

<u>Our key performance indicators continue to exceed plans</u>. Connections, which is our term for subscribers, devices and their connectivity usage, have grown over 4-point -- to over 4.6 million at the end of the fourth quarter. <u>36 Month Contractual Revenue Backlog converted into live production incremental monthly revenue was at 97% of scheduled conversion for the fourth quarter while we're **maintaining an average over 100% for the year**</u>.

* * *

Finally, as we mentioned during our last call, **we are decidedly a growth company**. . . .

94.    The statements made by Defendants and contained in the Company's March 5, 2019 and March 12, 2019 press releases and those statements made by Defendants during the March 12, 2019 Investor and Analyst Conference Call were each materially false and misleading when made, and were know by Defendants to be false at that time or were recklessly disregarded as such thereby, for the same reasons stated in ¶¶ 55-56 *supra* , and detailed in ¶¶ 132-160 *infra*.

95.    On March 15, 2019, Pareteum issued another press release again purporting to announce big contract wins.  The press release claimed the Company had acquired <u>10 new</u>

customers amounting to $17 million in the first-half of that month. This press release again quoted

Defendant Turner and Rob Mumby, as follows:

> Chief Revenue Officer Rob Mumby added, "We are seeing a fantastic response to our enhanced and expanded offering across all sectors. I am confident we will continue to gain traction with our market-leading cloud services as we move towards the next quarter."

> [Defendant] Turner, commented, "These new customer wins reflect our deep understanding of the challenges faced by a diverse range of dynamic, market-leading organizations, and the great response our solutions represent to those challenges. Our momentum continues to grow in the wake of our acquisitions of Artilium and iPass, and our One TEUM strategy is delivering rich rewards."

96.    On March 28, 2019, Pareteum again purported to announce big contract wins, this

time announcing a purported $50 million Global Expansion Contract with Streaming Media Brand.

This press release stated, in part, that "[t]he initial phase of the contract is valued in excess of $50

million, which is incremental to Pareteum's 36-month contractual revenue backlog."

97.    The March 28, 2019 press release again quoted Defendants Bozzo (identified as the

Company's CEO) and Turner (Executive Chairman), as follows:

> "This is a showcase significant strategic win for Pareteum which further proves the value of our recent acquisitions in driving cross- and up-sell opportunities within our addressable markets and rapidly growing customer base," said [Defendant] Bozzo. . . .

> [Defendant Turner] commented, "This latest partnership provides another great example of how Pareteum empowers brands to interact with customers to deliver targeted, locally relevant services and experiences, on a global basis. With our Global Smart Network, and Global Software Experience Platform, our brand partners can provide rich digital services from anywhere, to anywhere. Geographical boundaries no longer matter."

98.    On or about March 18, 2019, Pareteum filed with the SEC its 2018 year-end report

pursuant to Form 10-K, for the year ended December 31, 2018. This 2018 Form 10-K was certified

by Defendants Turner and O'Donnell pursuant to SOX, and signed by Defendants Turner, Bozzo

and O'Donnell, and prepared with the assistance of Defendant McCarthy.

99.    The 2018 Form 10-K revealed in Item 9A, entitled "Controls and Procedures" that there was a material weakness in the Company's internal control over financial reporting and disclosed that the Company's **disclosure controls and procedures were not effective as of December 31, 2018**.  The 2018 Form 10-K states, in relevant part, the following:

(a)    Disclosure Controls and Procedures.

. . . Our management, with the participation of our principal executive officer and chief financial officer (our principal financial officer), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 131-15(e) and 15d-15(e)) as of December 31, 2018. Based on that evaluation, **our management concluded that because of material weaknesses in its internal control over financial reporting, as further described below, our disclosure controls and procedures were not effective as of December 31, 2018**.

(b)    Management's Annual Report on Internal Control over Financial Reporting.

* * *

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2018 and in making this assessment used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013 Framework) in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Based on the foregoing evaluation, **our management has identified the following deficiencies that constitute material weaknesses in the Company's internal controls over financial reporting**:

**Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment**.

**Ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process**.

100.    According to the 2018 Form 10-K, the material weakness, however, did not result in any identified misstatements to the financial statements, and there were no changes to previously released financial results.

101.    Squar Milner LLP, the Company's purported independent registered public accounting firm, expressed an opinion for the audit of Pareteum's consolidated financial

statements as of and for the year ended December 31, 2018, and issued an adverse audit report on the effectiveness of the Company's internal control over financial reporting as of December 31, 2018, as follows:

### Report of Independent Registered Public Accounting Firm

To the Shareholders and the Board of Directors of Pareteum Corporation

**Opinion on the Internal Control Over Financial Reporting**

We have audited Pareteum Corporation's and its subsidiaries (the Company) internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. In our opinion, because of the effect of the material weaknesses described below on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013 ("COSO").

\* \* \*

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following deficiencies in internal control have been identified as material weaknesses over the Company's control environment and monitoring pursuant to the COSO framework:

Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment and ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

These material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the 2018 financial statements, and this report does not affect our report dated March 18, 2019.

**Basis for Opinion**

\* \* \*

We conducted our audit in accordance with the standards of the PCAOB. . . .We believe that our audit provides a reasonable basis for our opinion.

\* \* \*

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

\s\ Squar Milner LLP
Los Angeles, California
March 18, 2019

(bolding in original).

102.    Despite reporting the prior deficiency that purported to affect 2018, but not necessarily 2019, the 2018 Form 10-K also reported that there had been **no changes in internal control over financial reporting**.  As evidence of this, the 2018 Form 10-K stated, that:

There have been no changes in our internal control over financial reporting during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

103.    The 2018 Form 10-K also purported to report Pareteum management had *already* been implementing and continued to implement measures designed to assure that control deficiencies contributing to the material weakness were remediated, such that these controls were designed, implemented and operating effectively, as follows:

The remediation actions to the Company's internal controls over financial reporting include a thorough review and documentation of all processes involved in our financial reporting to ensure that there is segregation of duties, access security  and documented  review processes in place that happen at  appropriate intervals throughout the year that covers all elements of the Company's financial reporting. This includes, but is not limited to, testing samples and documenting that testing has occurred with the results of the findings being reported to senior management and that they occur at appropriate intervals and continuously making improvements to our processes as necessary.
* * *
**We believe that these actions will remediate the material weakness**. The weakness will not be considered remediated, however, until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. We expect that the remediation of this material weakness will be completed prior to the end of fiscal 2019.

104.    The statements made by Defendants and contained in the Company's March 15, 2019 and March 28, 2019 press releases, and those statements made by Defendants and contained in Pareteum's 2018 Form 10-K, were each materially false and misleading when made, and were know by Defendants to be false at that time or were recklessly disregarded as such thereby for the reasons stated in ¶¶ 132-160 *infra*.

105.    Remarkably, while the Squar Milner report highlighted the potential risks of material misstatements in and/or the reliability of the Company's financial statements, the Company's almost 10 full pages of purported "Risk Factors" (hereinafter "Risk Disclosures") contained in the 2018 Form 10-K did little or nothing to alert investors to the additional risks of investing in a Company that lacks sufficient controls and procedures, or the impact this was having on Pareteum at that time, including the impact on Defendants' inability to secure necessary agreements to enable Pareteum to utilize half of its $50 million Credit Facility, or the true financial and operational condition of certain new customers.

106.    In fact, the purported Risk Disclosures contained in the 2018 Form 10-K were completely ineffective and were designed to obfuscate the material risks of investing in Pareteum at that time, rather than disclose them as required.  These purported Risk Disclosures generally fell into one of three categories: (i) irrelevant, general statements that had nothing to do with Pareteum and that would generally apply to any company, in any business, located anywhere; (ii) obtuse and inadequate statements that were not effective to disclose the actual material adverse conditions then impacting the Company, and which disguised these negative conditions as possible contingencies that might or might not impact Pareteum at some point in the unknown future; and (iii) simply missing disclosures, such as the risk of investing in a company with no, or inadequate controls and procedures.

107.    Below are the first dozen purported business specific Risk Disclosures, in the order provided by Defendants within the 2018 Form 10-K (presumably reported in order of importance), and each one is an example of a general disclosure that is not specific to Pareteum and that could apply to almost any business, doing anything, anywhere as follows:

The _current economic climate, especially in Europe_, may have an adverse effect in the markets in which we operate.

Uncertainties and _risks associated with international markets_ could adversely impact our international operations.

We operate in a _complex regulatory environment_, and failure to comply with applicable laws and regulations could adversely affect our business.
We may not be able to _integrate new technologies and provide new_ services in a cost-efficient manner.

We may not be able to _develop and successfully market_ our mobile telecommunications platform and services as planned.

Implementation and development of our software platform business depends on our _ability to obtain adequate funding_.

_Disruptions in our networks and infrastructure_ may result in customer dissatisfaction, customer loss or both, which could materially and adversely affect our reputation and business.

_Integration of acquisitions ultimately may not provide the benefits originally anticipated_ by management and may distract the attention of our personnel from the operation of our business.

Our revenue, earnings and profitability are affected by the length of our sales cycle, and a _longer sales cycle could adversely affect our results_ of operations and financial condition.

Because most of our business is conducted outside the U.S., _fluctuations in foreign currency exchange rates_ versus the U.S. Dollar could adversely affect our results of operations.

_We are substantially smaller than our major competitors_, whose marketing and pricing decisions, and relative size advantage, could adversely affect our ability to attract and retain customers and are likely to continue to cause significant pricing pressures that could adversely affect our net revenues, results of operations and financial condition.

*Our positioning in the marketplace as a smaller provider places a significant strain on our resources, and if not managed effectively, could result in operational inefficiencies and other difficulties.*

108.    An example of the second type of ineffective and inadequate Risk Disclosure, identified above in ¶105-106 *supra*, where then current material adverse conditions impacting the Company are portrayed as mere contingencies which may or may not impact the Company, was also contained in the 2018 Form 10-K.  As evidence of this, Pareteum's last purported business specific Risk Disclosure stated the following, regarding the Post Road Group Credit Facility:

*We have outstanding debt secured by all of the assets of the Company, including our intellectual property, and failure by us to fulfill our obligations under the applicable loan transaction agreements may cause the repayment obligations to accelerate.*

In February 2019, we, and certain of our subsidiaries, entered into a credit agreement (the "Credit Agreement") with Post Road Administrative Finance, LLC and its affiliate Post Road Special Opportunity Fund I LLP (collectively, "Post Road"), pursuant to which Post Road will provide the Company with a secured loan of up to $50,000,000 (the "Loan") with an initial loan of $25,000,000 funded on February 26, 2019, and additional loans in increments of $5,000,000 as requested by the Company before the 18 month anniversary of the initial funding date: **provided however** that **no additional loans shall be funded until the later of delivery of certain third party consents (the "Consents"**). The Credit Agreement provides for all amounts due on February 26, 2022 and requires us to meet and maintain within specified levels and thresholds with respect to financial and operational covenants, including: **requirements to maintain a minimum of $2,000,000 of unrestricted cash, certain maximum total leverage rations, a debt-to-asset ratio, maximum churn rate and adjusted EBITDA**. The Credit Agreement further provides customary events of default and cure periods for certain specified events of default, and in the event of uncured default, the acceleration of the maturity date, an increase in the applicable interest rate with respect to amounts outstanding under the Loan and payment of additional fees. The Credit Agreement also provides for an increase in the interest rate upon failure to timely deliver Consents by May 31, 2019 or July 31, 2019, as applicable. **There can be no assurance that we will be able to perform and timely repay the amounts outstanding under the Credit Agreement, and upon the occurrence of an event of default under the Credit Agreement, if we are not able to repay all outstanding amounts required, we would lose control over our assets, including our intellectual property, which would seriously harm our business and operations**.

109.    In addition to being false and materially misleading, this purported Risk Disclosure failed to report that, at that time, Defendants had <u>already</u> failed to make timely payments under the Credit Facility, they were unable to obtain the signatures necessary to obtain the second 50% of the Credit Facility amount, and they were also in technical breach of the Credit Facility Covenants by failing to provide timely interim financial reports to the lender.

110.    The Company's other Risk Disclosures, related to Pareteum's industry participation and capital stock, were even more general and vague, lacking any specific relation to the Company at the time. These Risk Disclosures included, in part, the following:

> *<u>Changes in the regulation of the telecommunications industry</u> could adversely affect our business, revenue or cash flow.*

> *The market for communications services is highly competitive and fragmented, and we expect <u>competition to continue to increase</u>.*

> *The <u>telecommunications industry is rapidly changing</u>, and if we are not able to adjust our strategy and resources effectively in the future to meet changing market conditions, we may not be able to compete effectively.*

> *If we are not able to operate a cost-effective network, <u>we may not be able to grow</u> our business successfully.*

> *<u>We could issue additional common stock</u>, which might dilute the book value of our capital stock.*

> *<u>Shares eligible for future sale</u> may adversely affect the market for our common stock.*

> *<u>We have no dividend history</u> and have no intention to pay dividends in the foreseeable future.*

111.    The 2018 Form 10-K also contained certifications, signed by Defendants Turner and O'Donnell, pursuant to SOX, that purported to attest to the accuracy and completeness of Pareteum's financial and operational reports.  These certifications were the same, and/or were substantially similar to the certifications filed in connection with Pareteum's 2019 first quarter

Form 10-Q, reproduced herein in ¶¶ 123-124 *infra*, and were materially false and misleading and were known by Defendants to be false at that time, or were recklessly disregarded as such thereby, for the reasons stated herein, in ¶¶ 132-160 *infra*.

112.    On April 4, 2019, Pareteum issued another press release, this time purporting to announce <u>$100 million in New Sales Agreements During March</u>.  Defendant Turner and Chief Revenue Officer Rob Mumby again used the Company's press release to condition the market to believe in the hyper-growth of the Company:

> [Defendant] Turner, commented, "We have developed, built, and delivered software services for a wide range of customers and we are rapidly moving into new markets and territories with 'communications reimagined' services. This record performance, <u>our very first $100 million new 36MCRB sales month</u>, reflects the strong value customers derive as they continue to buy our services. All Pareteum TEUMATES have had a hand in the performance and I congratulate each of our colleagues."

> Pareteum's Chief Revenue Officer, Rob Mumby, added, "<u>We continue to win great new customers</u> while positioning ourselves to become increasingly strategic to existing customers with our highly flexible cloud communications services."

113.    On May 7, 2019, Defendants published a press release announcing purported results for the first quarter of 2019, for the period ended March 31, 2019.  This press release stated, in part, the following:

> *Pareteum Announces First Quarter 2019 Financial Results*
> *Q1 Revenue of $23 Million Drives Growth of 460% Year-over-Year*
> *Q1 Adjusted EBITDA of $5.2 Million*
> *Net Dollar-Based Expansion Rate of 144% Year-over-Year*
> *Increases Full Year 2019 Guidance – Projecting 255-285% Year-over-Year*
> *Revenue Growth*
>
> * * *
>
> **FIRST QUARTER 2019 FINANCIAL RESULTS:**
> **(Unless otherwise noted, all comparisons are made to the first quarter of 2018)**
>
> * Total revenues increased 460% to $23 million Adjusted EBITDA increased 1,723% to $5.2 million
> * Non-GAAP EPS of $0.02 cents

- Artilium and iPass financials are consolidated and accretive in Pareteum's first quarter results
- Net Dollar-based expansion rate represented 144% growth
- Increase in total assets from $27.2 million at March 31, 2018 to $236.9 million at March 31, 2019
- Cash balance of $10.7 million
- **KEY FIRST QUARTER OF 2019 OPERATIONAL METRICS:**
- 36-Month Contractual Revenue Backlog increased to $938 million for the first quarter of 2019, up from $200 million in the first quarter of 2018 with a conversion rate to revenue of 101%
- Connections increased 441% to 12,012,000 for the first quarter of 2019, and grew 161% sequentially in the first quarter of 2019
- First quarter average annualized revenue per employee of $390,000, an increase of 55% year over year

| Sequential Quarterly Key Metrics | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ($000's) | Q1 2019 | | Q4 2018 | | Q3 2018 | | Q2 2018 | | Q1 2018 |
| REVENUE | 23,040 | | 14,312 | | 8,008 | | 6,003 | | 4,113 |
| YEAR-OVER-YEAR REVENUE GROWTH | 18,927 | 460% | 10,297 | 256% | 4,509 | 129% | 2,764 | 85% | 1,318 | 47% |
| GROSS MARGIN | 12,972 | 56% | 9,085 | 63% | 5,879 | 73% | 4,223 | 70% | 2,918 | 71% |
| ADJUSTED EBITDA | 5,156 | | 2,339 | | 1,782 | | 1,297 | | 283 |
| EBITDA | (2,485) | | (3,093) | | (5,851) | | 597 | | (869) |
| CASH BALANCE | 10,699 | | 6,052 | | 18,865 | | 19,205 | | 15,759 |
| 36 MONTH CONTRACTUAL REVENUE BACKLOG | 938,000 | | 615,000 | | 403,000 | | 276,000 | | 200,000 |
| CONNECTIONS | 12,012 | | 4,609 | | 2,903 | | 2,714 | | 2,220 |

(bolded and italicised headings in original).

114.    In addition to the foregoing, the May 7, 2019 press release also quoted Defendant

Turner, in part, as follows:

"We are very pleased with our strong first quarter results, delivering 460% revenue growth in Q1 2019 compared to Q1 2018. Pareteum's core business, pre-acquisitions, has grown 33% over the prior quarter," commented [defendant] Turner. "We are proud of the significant business transformation we have achieved over the past few years. **Pareteum is a fast-growing and profitable** SaaS and communications service provider. **Our software and platform solutions are unique in the market**, our global TEUM is executing, **we are well positioned to capture the large market opportunity**, and we are committed to our mission to connect every person and every(thing)™."

115.    Regarding the Company's purported 2019 first quarter "RECENT BUSINESS HIGHLIGHTS," Defendants again reported on the $50 million Credit Facility obtained in February 2019, as follows:

- The Company closed a $50 million credit facility with Post Road Group in February 2019. **An initial draw of $25 million will be used to repay the debt and transaction costs associated with the iPass transaction and to facilitate accelerated organic growth and potential M&A transactions**

116.    This press release purported to provide and update "2019 FULL YEAR GUIDANCE," which again raised purported growth expectations – now as high as <u>285% year-over-year</u> – as follows:

We expect revenue to be between <u>$115 million and $125 million for the full year of 2019</u>. Adjusted EBITDA and Cash Flow, net of restructuring and acquisition costs will be positive for the year.

We are expecting 2019 <u>revenue growth in the range of 255% to 285% year-over-year</u>, outpacing the market growth rate fivefold to be updated quarterly.

117.    Later the same day, on May 7, 2019, Defendants hosted an earnings call with analysts and investors during which they reiterated many of the same materially false and misleading statements as they had made previously in press releases and SEC filings.  In this regard, Defendant Turner used this opportunity to condition the market to believe, in part, in the Company's remarkable performance and hyper-growth:

"Now to our business at hand. <u>Pareteum is performing extremely well</u>. Without taking too much of Denis's thunder from his results review coming shortly. <u>We reported a 460% Q1 2019 over Q1 2018 revenue increase</u>, more from Denis on that shortly. However we are on target with our products delivered, those being developed, our markets served and those that we will expand to. Our customers who are onboarding now even more efficiently and our people, matching the very best resources to address every opportunity we have. In every sense, this Company has reimagined the future of communications and we're delivering on it today.

Our mission of connecting every person and everything is also on track. <u>We're on plan financially and we're well above our expectations and sales results</u>. We're raising the quality of customer experiences everyday and we're raising our results

46

and performance expectations with operational transparency. **As a growth Company, we're expanding in a financially responsible manner**."

118.    Regarding the Company's purported Backlog, Defendant Turner also stated during

the May 7 earnings call, in part, the following:

"To complete the 36-month contract revenue backlog topic, <u>the most important phase for Pareteum is to convert these contracts to billable revenues</u>. This means new sales orders placed into live production, based upon their contracted schedules for service, invoices rendered, being billed and revenues collected. <u>Our backlog conversion metrics show this story and we're doing very well in this regard.</u>

I'd like to share a couple of details with you. From the inception of tracking the services deployed during the period of January the 1st, 2017 through March the 31st of 2019, that's a 27-month period, <u>we converted revenues in the backlog as they were scheduled at 101%. We converted connections which is our word for subscribers at 122%.</u> This means that taking each contract and comparing what was contractually scheduled by the customers. In both the revenue and connections, we **we've over retained and outperformed what had been expected**. We're very pleased with this growth performance. But I must tell you we're even more pleased with what I'm about to say to you."

119.    During the May 7, 2019 earnings call, Defendant McCarthy (identified in the call

transcript as the Company's President), also stated, in part, the following:

"<u>We have achieved organic growth of 32% over the prior-quarter from the combined</u> Pareteum and our Artilium business . . .

* * *

As discussed on our year-end call, <u>we established a new $50 million credit facility</u> with Post Road Group and retired the more expensive debts acquired in the iPass acquisition. **The facility also provides us with significant available liquidity going forward should we need it.**

While **we currently have no plans for the additional capital to operate our business**, it **gives us additional security and flexibility**. I want to reinforce Hal's comments about the remarkable transformation that Pareteum has achieved, along with this rapid growth and transformation, <u>we have experienced some challenges including those related to our internal controls, primarily as a result of M&A integration.</u>"

120.    The statements made by Defendants and contained in the Company's April 4, 2019

and May 7, 2019 press releases, and those statements made during the Company's May 7, 2019

earnings call with analysts and investors, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the reasons stated herein in ¶¶ 132-160 *infra*.

121.    With the true adverse conditions still unknown to shareholders at that time, shares of the Company rallied on this positive news. As evidence of this, Pareteum common stock traded to just below $5.40 per share on May 7, 2019, on significant volume of almost 7.9 million shares, demonstrating a significant increase over the prior day's closing price of $5.18 per share. During the two-day period between May 7 and May 8, 2019, over 16 million of the Company's shares traded - - many times the average daily trading volume, as Pareteum shares traded well-above $5.00 per share.

122.    As shares of Pareteum continued to trade at artificially inflated levels, on May 10, 2019, Defendants filed with the SEC the Company's 2019 first quarter Form 10-Q, for the quarter ended March 31, 2019 (hereinafter "1Q:19 Form 10-Q"), signed and certified by Defendants Turner and O'Donnell. In addition to making substantially similar materially false and misleading statements concerning Pareteum's operations and customer growth as had been published previously, the 1Q:19 Form 10-Q also purported to report the Company's significant accounting policies and the basis of its accounting presentation, in part, as follows:

**Basis of Presentation of Interim Periods**

The interim condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP,") for interim financial information and in accordance with the instructions to Securities and Exchange Commission ("SEC"), Form 10-Q and Article 8 of SEC Regulation SX. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2018,

included in our 2018 Annual Report on Form 10K filed with the SEC on March 18, 2019, referred to as our 2018 Annual Report.

**The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods**. The results of operations for the three months ended March 31, 2019, are not necessarily indicative of the results to be expected for future quarters or the full year. All intercompany transactions and account balances have been eliminated in consolidation. . . .

123. In addition to the foregoing, the Company's 1Q:19 Form 10-Q contained certifications, pursuant to SOX, by Defendants Turner and O'Donnell, that purported to attest to the accuracy and completeness of Pareteum's financial and operational results, as follows:

**CERTIFICATION**

Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

I, [Defendant Turner or O'Donnell], certify that:

1. I have reviewed this quarterly report on Form 10-Q of Pareteum Corporation.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

49

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of a quarterly report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: May 10, 2019                      [Dated: May 10, 2019]
/s/ Robert H. Turner                      [/s/ Edward O'Donnell]
Robert H. Turner                          [Edward O'Donnell]
Executive Chairman                        [Chief Financial Officer]
Principal Executive Officer               [Principal Financial and Accounting Officer]

124.    Similarly, the Company's 1Q:19 Form 10-Q contained certifications, pursuant to SOX, by Defendants Turner and O'Donnell, that purported to attest to the Company's compliance with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and that

the Company's 1Q:19 Form 10-Q fairly presented the financial condition and results of operations of Pareteum:

## CERTIFICATION

### Pursuant to Section 906 of the
### Sarbanes-Oxley Act of 2002(18 U.S.C. 1350)

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. 1350), the undersigned officer of Pareteum Corporation, a Delaware corporation (the "Company"), does hereby certify, to the best of such officer's knowledge and belief, that to my knowledge:

(1)    The Quarterly Report on Form 10-Q for the quarter ended March 31, 2019 (the "Form 10-Q") of the Company fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    <u>The information contained in the Form 10-Q fairly presents, in all materials respects, the financial condition and results of operations of the Company</u>.

| Dated: May 10, 2019 | [Dated: May 10, 2019] |
|---|---|
| /s/ Edward O'Donnell | [/s/ Robert H. Turner] |
| Edward O'Donnell | [Robert H. Turner] |
| Chief Financial Officer | [Executive Chairman] |
| Principal Financial and Accounting Officer | [Principal Executive Officer] |

125.    The Company's 1Q:19 Form 10-Q also contained statements that continued to attest to the Controls and Procedures that persisted at Pareteum throughout the first quarter of 2019, for the period ended March 31, 2019, as follows:

**Item 4. Controls and Procedures**

Evaluation of Disclosure Controls and Procedures

As of March 31, 2019, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Principal Executive Officer and Principal Financial and Accounting Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. Based on the evaluation, the Company's Principal Executive Officer and Principal Accounting Officer have concluded that, <u>due a previously reported material weakness in our internal control over financial reporting described below, the Company's disclosure controls and procedures were</u>

not effective as March 31, 2019. **In light of the material weakness described below, we performed additional analysis and other post-closing procedures to ensure our financial statements are prepared in accordance with generally accepted accounting principles.**

126.    In addition to the foregoing assurances, according to the 1Q:19 Form 10-Q, by March 31, 2019, Defendants reported that substantial remediation had <u>already</u> occurred and that the material weakness had been "<u>remediated . . . pending further testing</u>." As evidence of this, the 1Q:19 Form 10-Q stated, in part, the following:

> We also continue to develop certain remediation steps to address the material weakness discussed above to improve our assessment of internal control over financial reporting. As of March 31, 2019, these efforts are ongoing.

> We are committed to maintaining a strong internal control environment and believe that these remediation actions will represent significant improvements in our controls. However, the identified material weakness in internal control over financial reporting will not be considered remediated until controls have been designed and/or controls are in operation for a sufficient period of time for our management to conclude that the material weaknesses have been remediated. Additional remediation measures may be required, which may require additional implementation time. We will continue to assess the effectiveness of our remediation efforts in connection with our evaluations of internal control over financial reporting.

127.    The 1Q:19 Form 10-Q did nothing to update or enhance the Risk Disclosures previously provided in Pareteum's 2018 Form 10-K filed on March 18, 2019 (*see* ¶¶ 105-110 *supra*).  Instead, the 1Q:19 Form 10-Q "Item 1A. Risk Factors" simply referred investors back to the 2018 Form 10-K, as follows:

> In addition to the other information set forth in this Quarterly Report on Form 10Q, you should carefully consider the Risk Factors included in Part I, Item 1A. "Risk Factors" of our Annual Report on Form 10K for the year ended December 31, 2018, and the Risk Factors included in Part I, Item 1A. – "Risk Factors" of our Quarterly Report on Form 10Q for the period ended September 30, 2018. These Risk Factors could materially impact our business, financial condition and/or operating results. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely impact our business, financial condition and/or operating results.

128.    The statements, described in ¶¶ 122-126, made by Defendants and contained in the Company's 1Q:19 Form 10-Q were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the reasons stated in ¶¶ 55-56 *supra* and further detailed in ¶¶ 132-160 *infra*.

129.    On May 14, 2019, Pareteum published a press release announcing that Company management would host the "*Pareteum Power, an Analyst & Investor Day*" on May 28, 2019, in New York, New York.  According to this press release, attendance was by invitation only, an RSVP was required to attend, and no location was provided.

130.    On May 15, 2019, Defendants again published a press release that purported to announce <u>$70 million in New Sales Agreements in April</u> in connection with the closing of at least <u>20 new sales transactions</u>.  This press release quoted Defendant Turner and Chief Revenue Officer Rob Mumby, as follows:

> "<u>We continue to drive growth through our sales efforts</u> as our addressable markets expand and our cloud-based SaaS products and solutions are able to deliver new requirements in an increasingly connected world," said [Defendant] Turner. . . . "At Pareteum, we believe we are 'all in sales' and we are pleased with another strong monthly performance."
>
> "<u>Each new customer represents an opportunity to build a unique and strategic relationship and facilitates cross-sell and up-sell of our expanding suite of global cloud software capabilities</u>," added Rob Mumby. . . .

131.    The statements made by Defendants and contained in the Company's May 14, 2019 and May 15, 2019 press releases, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the reasons stated herein in ¶¶ 132-160 *infra*.

**The True Financial & Operational Condition
of Pareteum is Belatedly Disclosed**

132.     On June 7, 2019, the first of two very critical independent research reports related to Pareteum were published.[10] The Aurelius Report revealed, for the first time, that: (i) Pareteum and the Individual Defendants were engaged in a fraudulent scheme to inflate revenues and the Company's order Backlog, by fabricating clients and/or claiming that certain clients have the ability to generate tens of millions of dollars in revenue when they do not; (ii) the Company had failed to disclose material facts about its officers, board members, significant investors and senior staff; and (iii) that the Company was "completely uninvestible" and subject to "massive downside potential[.]"

133.     The Aurelius Report, entitled *TEUM: Where Are The Customers?*  stated, in part, the following:

> **TEUM's public claims simply don't hold up to investigative scrutiny**. For example, TEUM touted a contract with the South Africa based "Eyethu Mobile Network" as part of a group of deals, purportedly worth $50 million in aggregate, that TEUM says it signed in the last two weeks of August 2018. . . . <u>Our investigators went to visit Eyethu/EMN's headquarters but discovered only a dilapidated shack and crumbling structures near a rural African village</u> . . .
>
> Documents and detailed forensic evidence presented throughout this report shows that <u>Eyethu is only the tip of the iceberg of small or defunct entities across the world that TEUM claims to have signed valuable contracts with</u>.

134.     The Aurelius Report also stated that "**[Pareteum's] Purported $900 Million Backlog Appears Significantly Exaggerated or Fictitious**," as follows:

---

[10]*TEUM: Where Are The Customers?*, Marcus Aurelius Value (June 7, 2019), http://aureliusvalue.com/research/teum-where-are-the-customers. (hereinafter "Aurelius Report"); *Parateum – The Wild West of Telecoms*, Viceroy Research (June 25, 2019), https://viceroyresearch.org/2019/06/26/pareteum-the-wild-west-of-telecoms/ (hereinafter "Viceroy Report").

The foundation of the Pareteum growth story is built on the company's supposedly large and fast-growing 36-month backlog, which management now says exceeds $900 million. But **<u>our investigation identified a variety of purportedly valuable customers that appear wholly incapable of paying TEUM anywhere near the large contractual values that TEUM has touted</u>**. Examples include:

- **A nearly-worthless penny-stock managed by a former AudioEye executive named alongside TEUM's CFO in the fraud suit.**

- **African entities that show no signs of meaningful business activity.**

- **Contracts with crypto-companies including one that recently settled with the SEC and "agreed to return funds to harmed investors."**

- **Closed or dissolved businesses.**

- **Websites that are inactive or offer limited contact information.**

- **Businesses that don't answer the phones or report having minimal employees.**

- **European entities with tiny amounts of capital or revenue.**

- **Featured customers located in apartment buildings.**

- **Millions in loans to an entity bleeding cash.**

- **A purported $50 million contract with an entity in Thailand that reports having zero 2018 revenue, years of losses, and involvement with a crypto-coin that has lost 97% of its peak value.**

<u>We also found irregularities and embellishments involving a significant portion of the "notable partners and customers" that TEUM highlighted in a graphic at its recent analyst day</u>, suggesting TEUM struggles to find enough legitimate new customers to even fill a simple slide.

135.    The Aurelius Report further concluded that, in light of the foregoing, that

"**[Pareteum's] Backlog Conversion and Receivables Signal Serious Potential Accounting**

**Problems**[,]" and stated in part, the following:

**<u>The accounting fraud that TEUM's CFO allegedly perpetrated at AudioEye involved the booking of phantom revenues to artificially inflate the stock price.</u>** Bulls have taken comfort in management's assurances that TEUM's backlog has converted to revenue at over 100% of contractual rates thus far. But we <u>find</u>

TEUM's backlog conversion rate highly problematic considering that our research has flagged so many small or defunct customers. If exaggerated contractual values are now being recognized as revenue, then we believe TEUM will face serious accounting problems. TEUM's receivables have already begun to balloon after growing at sequential rates far faster than revenues in each of the last four quarters. TEUM's small California auditor, which was specifically cited by the PCAOB for audit deficiencies related to revenue, gives us no comfort.

* * *

**The accounting fraud that TEUM's CFO allegedly perpetrated at AudioEye involved the booking of phantom revenues to artificially inflate the company's stock price. Is it possible that this exact kind of scheme is now occurring at TEUM?**

Bulls have taken comfort in management's assurances that backlog has converted to revenue at over 100% of contractual rates thus far.  Backlog turning into actual revenue, the thinking seems to go, is a sign that TEUM's new contract wins must be high quality in nature. Conversely, we find TEUM's backlog conversion rate highly problematic considering that our research has flagged customers that are small, defunct, or seem unlikely to be able to pay TEUM anywhere near the large contractual values that TEUM has touted. If these kinds of exaggerated contracts are now being recognized as revenue, as management's commentary indicates, then we believe TEUM will face serious accounting problems.

This is exactly why we're troubled that TEUM's receivables have grown at sequential rates far faster than revenues in each of the last four quarters. For example, revenues grew 64% to $23M in Q1 2019 from $14M in Q4 2018 but receivables ballooned 86% to $28M from $15M over the same period.  This is puzzling because TEUM's own SEC filings state that "the company typically bills its customers at the end of each month, with payment to be received shortly thereafter", which we believe should naturally result in relatively minimal receivables. But TEUM's Days Sales Outstanding has reached 110 days as compared 39 days of Twilio (TWLO), a company that promoters like to compare TEUM to, suggesting that TEUM's customers may already be falling behind on their bills.

TEUM's small California auditor, Squar Milner, gives us no additional comfort. Squar has audited at least one company owned by Barry Honig, True Drinks Holdings (TRUU), an equity that is now virtually worthless. More importantly, **the Public Company Accounting Oversight Board ("PCAOB") uncovered significant deficiencies in its most recent inspection of Squar in 2017**.  The PCAOB stated in its report that "in other words, in these audits, the auditor [Squar] issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misstatement." The PCAOB even identified two significant deficiencies in a Squar audit specifically related to the valuation of revenue . . .

136.    The Aurelius Report also disclosed, for the first time, that Pareteum's management and executive teams have ties to previous alleged frauds and failures, and stated in part, the following:

**TEUM Has Surrounded Itself with Veterans from Failed Stock Promotions**

**We discovered a network of actors behind TEUM whose mere presence should send diligent investors running for hills**. TEUM has paid promoters, used a placement agent, and attracted large investors that are <u>veterans of numerous previous stock promotions Honig was an investor in, many of which have since declined to near worthlessness</u>. We discovered that TEUM's **relationship with Honig's longtime securities law firm, Sichenzia Ross**, is so close that the address that TEUM's lists on its website as its "USA Headquarters" is actually Sichenzia's main office.  TEUM has issued tens of millions in shares, warrants, and convertible preferred securities in a series of complex private placements with the assistance of **Sichenzia, who is being sued by a former client for allegedly helping create "ownership blockers" for Honig's group as part of an alleged pump and dump scheme that left that company bankrupt and unable to even validate its number of shares outstanding**….

* * *

**TEUM's Management Team Has Extensive Ties to Previous Alleged Frauds and Failures**

**TEUM's biographies of Turner and Chief Operating Officer, Denis McCarthy, fail to disclose their respective roles as CEO and CFO of Catcher Holdings, a now worthless stock that was owned by a group that included an entity controlled by Barry Honig, who was charged by the SEC last October with fraud for allegedly masterminding a series of pump and dump schemes.** On May 22nd, CNBC reported there is a parallel criminal investigation into Honig's alleged pump and dump ring being conducted by the U.S. Attorney's Office of San Francisco.

* * *

**We also learned that TEUM's CFO, Edward "Ted" O'Donnell, was sued by Audioeye investors for fraud after he allegedly "personally affected the fraudulent booking of revenues" that triggered a restatement erasing 92% of the company's reported revenue over the relevant period**. The lawsuit alleged that the fraud was designed to "give the market the false notion that revenue growth was accelerating" and "artificially inflate AudioEye's stock price" (O'Donnell denied the allegations and the lawsuit appears to have been settled). O'Donnell resigned from AudioEye in March 2015 and joined TEUM in January 2017.

* * *

**While Chairing TEUM's Audit Committee, Laura Thomas was also the CFO of TowerStream, a nearly worthless equity owned by Honig**. Thomas moved from the TEUM Board to an executive role at TEUM in December 2018 and resigned from TowerStream in January 2018.

TEUM's longtime investor relations representative was Stephan Hart (aka Steven or Stephen Hart) who disappeared from TEUM press releases earlier this year after being added to the list of prohibited service providers by OTC markets. **Hart was representing TEUM even though he was sentenced to prison in August 2015 for obstruction of justice and perjury following charges by the SEC for "illegal trading schemes" in December 2012.**[11]

137.    The Aurelius Report stated that Pareteum had surrounded itself with many veterans

from failed stock promotions, detailing in substantial part, the following:

While Honig is not named as a TEUM investor, we uncovered a series of relationships that make it hard for us to rule out the possibility that his invisible hand could be at work. **At absolute minimum, it's clear to us that TEUM is backed by a seasoned crowd of veterans from dubious stock promotions**:

- TEUM is represented by **Sichenzia Ross, the securities law firm of record for at least 22 companies that Honig and/or John Stetson, an alleged member of the pump and dump ring**, have invested in since 2009. Bizarrely, the relationship between TEUM and Sichenzia is so close that the address **TEUM's lists on its website as its "USA Headquarters" is actually Sichenzia's Main Office**. A 2017 Sichenzia press release states that Sichenzia has a long-term lease for the entire 37th floor that Pareteum currently lists as its address.

* * *

- TEUM uses the same placement agent as Mabvax [Theraputics][12] did, a Boca Raton broker named Dawson James Securities that also now issues favorable research reports on TEUM. According to our analysis, **Dawson James has been engaged by 13 different companies that have been owned by Honig, most of which have declined more than 75% from their peak value and/or are now virtually worthless.**

- While we are unable to identify all of TEUM's private placement investors, **two firms that have regularly invested alongside Honig, Iroquois Capital and**

---

[11] Stephen Hart appeared as an investor relations contact on Pareteum's press releases, at least until March 5, 2019. Mr. Hart is identified as a representative of an entity identified as Hayden IR, with what appears to be a cell phone contact number (area code 917 is predominately a cell exchange in the New York city metro area).

[12] The Aurelius Report identifies Mabvax Theraputics as a "worthless penny stock that the SEC says was the scene of a Honig-led pump and dump[.]"

**IntraCoastal Capital, owned or controlled 13.2% of TEUM's outstanding shares as of March 2018,** according to an SEC filing. By our count, Iroquois and/or Intracoastal have collectively invested in a total of 34 publicly traded companies that were also owned by Honig, most of which have either declined more than 75% from their peak value or are now virtually worthless. **A February 2019 SEC filing reported that Iroquois Capital has already dumped their entire TEUM stake**. We note that Iroquois reportedly received an SEC subpoena as part of the investigation into Honig's alleged pump and dump ring but was not named in the SEC complaint or been accused of wrongdoing.

- TEUM has paid stock promoters from Red Chip companies, which has previously touted numerous now worthless companies backed by Honig. . . .

138.     Based on the foregoing, the Aurelius Report concluded that, "**[j]ust in isolation, we believe the mere presence of this collection of actors should send diligent investors running for hills**." (emphasis in original)   If that was not clear enough, the Aurelius Report concluded as it began, by stating that, "**[i]n our opinion TEUM's stock is completely uninvestible . . . [with] massive downside potential**." (emphasis in original).

139.     These June 7, 2019 revelations that Pareteum had materially misrepresented its financial and operational condition, the true value of its Backlog, the connections between management and prior failed dubious stock promotion schemes, and the Company's results of operations, caused shares of Pareteum stock to fall precipitously.  As evidence of this, that day, shares of the Company collapsed almost 45%, from a close of about $3.50 per share on June 6, 2019, to an intra-day low of just over $2.00 per share -- on very high single-day trading volume of over 26 million shares traded.

140.     On June 26, 2019, shares of Pareteum declined another 19% after publication of the Viceroy Report, *The Wild West of Telecoms*." This report substantially agreed with the findings of the Aurelius Report, and further revealed the following:

**Pareteum – The Wild West of Telecoms**[13]

June 25, 2019 – Pareteum (NASDAQ:TEUM) provides services to Mobile Virtual Network Operators (MVNOs), who sell data/minutes to users and purchase data/minutes from telecom network operators. Recently Pareteum has been subject to criticism from other short sellers. Given the discourse, Viceroy believe it is prudent that we also share our findings.

- Further to recent research reports, Pareteum has a history of promotional press releases of customer wins. A deeper investigation into these customers show much larger number are insignificant, and the companies behind them appear in **no way capable of fulfilling the contract values advertised by Pareteum**.

- Two of Pareteum's customer wins appear to be **undisclosed related parties** tied to Pareteum consultant Dinesh "Danny" Patel.

- **One of Pareteum's announced customer wins is a company under a historic investigation and charged with significant VAT evasion fraud**. Information on this is easily available, leading us to believe that Pareteum was aware of the company's issues while announcing the customer win.

* * *

- **Several entities on the pareteum.cloud domain are small companies or have no web presence whatsoever**, leading us to believe that they are Pareteum customers who are unable to pay or have no operations.

* * *

- **Pareteum's management has a history of dishonest reporting**. Notably, CFO Ted **O'Donnell** who was sued by former employer AudioEye for fabricating US$8.1m worth of revenue over 3 quarters which was found to have no supporting documentation. This was an overstatement of revenues in the period of more than 3,000%.

- **Pareteum's rapid-fire announcement of customer wins mirrors its announcements regarding cryptocurrency in 2017**, which were put to an abrupt halt when a response to an SEC letter revealed TEUM had made no revenue, nor planned to do so, from cryptocurrency.

---

[13] As one market analyst noted, "[s]hares of Pareteum lost 24% of value on June 7 after a short call by Aurelius Value. To that, Viceroy says "Kudos to Aurelius Value for beating us to the punch. We identify further non-existent contracts, undisclosed related parties, and an apparent breach of Iran sanctions." *See* Jason Aycock, *Pareteum -18.7% as Viceroy piles on short reporting*, SEEKING ALPHA (June 26, 2019, 3:01 PM), https://seekingalpha.com/news/3474049-pareteum-minus-18_7-percent-viceroy-piles-short-reporting.

141.    Based on the foregoing inflation of the Company's foreseeable Backlog by Defendants, the Viceroy Report also concluded that a breakdown of Pareteum's revenues, cash flows and receivables show **the majority of its revenue** from sources other than Vodafone[14] and acquired businesses iPass and Artilium **appears to be uncollectable.** Accordingly, Viceroy concluded that, **"total revenue is overstated by 42%"** – corroborating its findings regarding Pareteum's customers.

142.    The Viceroy Report also stated that "Pareteum's 36-month contractual [Backlog] measurement [was] not an accurate predictor of future profits" and, that an analysis of the Company's Backlog and management comments demonstrates that **Pareteum "should have reported 73.10% more revenue in Q1 2019**[.]" According to the Viceroy Report, **"[m]anagement appears to be inflating this [Backlog] figure to hype up the share price and reassure investors**."

143.    In addition to the foregoing, the Viceroy Report also disclosed that "Pareteum appear[ed] to be in breach of US sanctions against Iran through its provision of services to Iranian MVNO Amin SMC[;] Amin SMC appears to be chaired by Hamid Reza Amirinia, an individual suspected of breaching sanctions . . . to launder money for [the Iranian government]."

144.    The Viceroy Report described Pareteum's **hyper-growth as "suspicious."** Further stating:

> "After our investigation **we believe this growth story is completely broken and may not have ever existed at all.** Investors should take a look at the damage inflicted on Catcher Holdings, Davnet and AudioEye as a sign of things to come if management is investigated or held accountable for its actions.

---

[14] The Viceroy Report notes that Vodafone Enabler S.L., an MVNO operating on Vodafone Spain's network, is Pareteum's "largest historical customer."

We advise investors to **call for a fully independent investigation of management**, in particular: Hal **Turner** and Ted **O'Donnell** and for an **investigation of the Company's revenue recognition practices and internal controls**."

145.    The chart below evidences the sudden and dramatic decline in the price of Pareteum shares following the publication of the Aurelius Report and the Viceroy Report:



146.    After reading both the Aurelius and the Viceroy Report, one market commentator stated that the case against Pareteum can be summarized as follows:

1.    **Contract backlog seems to be overstated by a material amount, threatening future growth expectations.**

2.    **Accounts receivable balances are ballooning, raising questions on the collectability of billings and the company's ability to achieve its target of positive cash flow for FY2019 and beyond.**[15]

147.    In an effort to restore investor confidence, on July 1, 2019, Pareteum pre-announced results for the second quarter 2019, the period ended June 30, 2019, that would purportedly

---

[15] Henrik Alex, *Pareteum's Q2 Upside Preannouncement Not Suited To Restore Investor Confidence*, SEEKING ALPHA (July 3, 2019, 9:10 AM) https://seekingalpha.com/article/4273291-pareteums-q2-upside-preannouncement-suited-restore-investor-confidence.

"exceed current analysts' consensus of $26.2 million for revenue and $4.1 million for Adjusted EBITDA."

148.    In fact, however, and as pointed out by a market commentator, [16] while shares initially traded up 15% in pre-market, Pareteum stock finished the trading session "basically unchanged" as investors realized that "the vague pre-announcement lacked important information required to reinforce investor confidence."  This commentator further noted that "[w]hile better than expected top and bottom line numbers are attractive, they are actually worth very little if accounts receivable have continued to balloon, further negatively impacting cash flows" as they had during the first quarter of 2019 when Pareteum reported adjusted EBITDA of $5.2 million on $23.0 million in revenues, but **free cash flow was actually negative by $5.5 million** even when adjusting for $2.7 million in additional loans to the ominous Yonder Mobile Media entity.[17]

149.    In reaction to the Company's July 1, 2019 pre-announcement of second quarter results, the same market commentator stated that, "[f]rankly speaking, Q2 cash flows should be improved meaningfully particularly given management's statements regarding the recent iPass acquisition on the Q1/2019 conference call."[18]

150.    On August 23, 2019, the Company filed with the SEC a "WAIVER AND FIRST AMENDEMENT TO CREDIT AGREEMENT," (hereinafter "WAIVER") related to Pareteum's Post Road Group Credit Facility in order to obtain a waiver of default and small amount of additional cash, as follows:

**WAIVER AND FIRST AMENDMENT TO CREDIT AGREEMENT**

---

[16] *Id.*
[17] *See* Viceroy Report *supra* at n.10 ("Pareteum has made an US$3.7m loan to Yonder Media Mobile, an early stage MVNO operated by serial failure entrepreneur Adam Kidron. Kidron has burned at least US$100m in his enterprises, having already cratered the Yonder brand with a music streaming service which collapsed in 2017.")
[18] Henrik Alex, *Pareteum's Q2 Upside Preannouncement Not Suited To Restore Investor Confidence*, SEEKING ALPHA (July 3, 2019, 9:10 AM) https://seekingalpha.com/article/4273291-pareteums-q2-upside-preannouncement-suited-restore-investor-confidence.

This WAIVER AND FIRST AMENDMENT TO CREDIT AGREEMENT dated as of August 22, 2019 (this "Amendment") is by and among PARETEUM CORPORATION, a Delaware corporation (the "Borrower"), the guarantors party hereto (the "Guarantors" and together with the Borrower, each a "Credit Party" and, collectively, the "Credit Parties"), the lenders party hereto (each a "Lender" and, collectively, the "Lenders"), POST ROAD ADMINISTRATIVE LLC, a Delaware limited liability company ("Post Road"), as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent") and Post Road, as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent", and together with the Administrative Agent, collectively, the "Agents" and each an "Agent"), and relates to that certain Credit Agreement dated as of February 26, 2019, by and among the Borrower, the Credit Parties party thereto, the Lenders party thereto and the Agent (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

WHEREAS, the Borrower has requested that the **Administrative Agent (a) waive the breaches of certain obligations and covenants under the Credit Agreement as set forth in greater detail on Annex A** attached hereto for the periods specified therein, as applicable (collectively, the "Subject Obligations and Covenants" and (b) amend the Credit Agreement as set forth herein; and

WHEREAS, the Administrative Agent is willing to acquiesce to the Borrower's request, subject to the terms and conditions outlined in this Amendment.

151.    **Annex A** to the WAIVER <u>contained a list of at least 11 breaches</u> and conditions that it appeared the Company had failed to satisfy under its February 2019 Credit Facility, including the Subject Obligations and Covenants, as follows:

1. To comply with the requirements set forth in the definition of "Permitted Acquisition" in connection with the consummation of the DeviceScape Acquisition as required by clause (m) of Section 9.05 of the Credit Agreement.

2. **To timely make the interest payment owed to the Administrative Agent for the Period that ended on or about March 31, 2019,** as required by Section 2.09(b) of the Credit Agreement.

3. **To timely deliver (i) the financial reporting information for the fiscal month ending February 28, 2019** as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

4. **To timely deliver (i) the financial reporting information for the fiscal month ending March 31, 2019** as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

5. **To timely deliver (i) the financial reporting information for the fiscal quarter ending March 31, 2019** as required by Section 8.01(b) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

6. **To timely deliver (i) the financial reporting information for the fiscal month ending April 30, 2019** as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

7. **To timely deliver (i) the financial reporting information for the fiscal month ending May 31, 2019** as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

8. **To timely deliver (i) the financial reporting information for the fiscal month ending June 30, 2019** as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

9. **To timely deliver the [***] Consent and Acknowledgment** as required by Section 8.17 of the Credit Agreement.

10. **To timely deliver the [***] Consent and Acknowledgment** as required by Section 8.17 of the Credit Agreement.

11. To comply with Sections 8.10 and 8.11 of the Credit Agreement in connection with the formation of its wholly-owned subsidiary DeviceScape Holdings, Inc., a Delaware corporation, and its acquisition of certain assets from DeviceScape Software, Inc., a California corporation, on or about April 22, 2019.

152.    As a condition of obtaining $2.5 million in additional financing and the above referenced waiver, Pareteum was forced to issue 750,000 additional shares of common stock to Post Road Group, thereby further diluting existing shareholders.  Moreover, these belated disclsoures also had an immediate negative impact on the price of Pareteum shares, causing the

stock to fall from just under $3.00 per share on August 23, 2019, to just above $2.00 per share on the next trading day, August 26, 2019.

153.    The following day, August 27, 2019, a report was published on the *Seeking Alpha* investor information website, titled, "*Pareteum - Caught In A Cash Crunch After Violating Debt Covenants.*"[19]  This report stated, in part, the following:

> Shares of controversial emerging Communications Platform as a Service ("CPaaS") provider Pareteum Corporation have remained under pressure in recent weeks after **the company's Q2/2019 results on August 6 revealed two major issues:**
>
> - **Accounts receivable ballooned an eye-catching 57% quarter-over-quarter**, even outpacing the 48% sequential revenue increase. **Over the past six months, accounts receivable have almost tripled from $15.4 million at year end 2018 to $45.1 million at the end of Q2**.
>
> - Free cash flow for the quarter was negative $8 million, leaving the company with just $3.4 million in unrestricted cash at the end of Q2, **dangerously close to the $2 million minimum liquidity covenant defined in its up to $50 million senior secured credit facility** with Post Road Group, a Connecticut-based junior private investment firm. For the first half of FY2019, Pareteum used $16.7 million in operating and investing activities.
>
> On the conference call, management actually pointed to **accounts receivable to increase even further during Q3** with collections starting to come through in Q4.

154.    Astutely, this August 27, 2019 *Seeking Alpha* report stated that a highly dilutive secondary offering was going to be required to enable Pareteum to raise money, as a result of its impaired financial and operational condition.  This report, observed in part, the following:

> Personally, I do neither expect the company to return to covenant compliance in due time nor the accounts receivable issue starting to resolve itself by next quarter. Accordingly, **investors might have to prepare for a large, secondary offering in the not too distant future.**

---

[19] Henrik Alex, *Pareteum – Caught In A Cash Crunch After Violating Debt Covenants*, SEEKING ALPHA (August 27, 2019, 7:34 AM), https://seekingalpha.com/article/4288112-pareteum-caught-cash-crunch-violating-debt-covenants.

Should the company not start to collect on its accounts receivable in due time, **Pareteum will likely lose its ability to access the capital markets with bankruptcy being the ultimate outcome in this case**.

Given the recent, negative developments and the company's increasingly uncertain outlook, **investors should continue to avoid the shares or sell existing positions.**

155.    The August 27, 2019 *Seeking Alpha* report further warned that:

At this point, the company might still be able to sell additional equity but <u>given the requirement to raise at least $35-$40 million to repay the [C]redit [F]acility including considerable exit fees and bridge the gap to anticipated cash collections in Q4 would likely cause the stock to tumble well below the $2 mark, particularly if investors require Pareteum to issue warrant sweeteners or even enter into a toxic financing transaction.</u>

Frankly speaking, **things are really starting to look ugly for Pareteum**. The company has been in breach of debt covenants basically right from the closing date of the credit agreement with Post Road Group in February and seems now caught in a severe cash crunch.

156.    The August  27, 2019 *Seeking Alpha* Report concluded that, "[b]ottom line:"

As of this point, it seems that the skeptics have been right on Pareteum as the company is obviously experiencing a cash crunch with **the lender only reluctantly providing additional liquidity to keep the company afloat for now**.

Should Pareteum again fail to comply with the covenants and obligations under the amended credit agreement, **Post Road Group might very well chose to issue a notice of default, requiring the company to repay the almost $28 million currently outstanding under the facility within short notice.**

157.    On September 20, 2019, the August 27, 2019 *Seeking Alpha* Report's prophecy of a large dilutive offering with "sweeteners" to entice otherwise non-existent buyers, became a reality.  That day, September 20, 2019, Pareteum published a press release announcing a dilutive $40 million offering of common stock and warrants that immediately drove the price of the Company's stock to just above $1.50 per share, after closing at $1.84 per share on the prior trading

day.  The placement agent of this registered direct public offering led by two institutional investors was Dawson James Securities, Inc., *see supra* at ¶27.[20]

158.    This $40 million offering consisted of:

- **18,852,273 Common Stock Units**, consisting of one share of Pareteum's common stock together with one Series A Purchase Warrant to purchase one share of Pareteum's common stock and one Series B Purchase Warrant to purchase one-half share of Pareteum's common stock.

- **3,875,000 Pre-Funded Units**, consisting of one pre-funded warrant to purchase one share of Pareteum's common stock together with one Series A Purchase Warrant to purchase one share of the Pareteum's common stock and one Series B Purchase Warrant to purchase one-half share of Pareteum's common stock.

159.    Finally, on October 21, 2019, the full truth was fully revealed when Pareteum published a press release, announcing "that the Company will restate its previously issued consolidated financial statements as of and for the full year ended December 31, 2018, and interim periods ended March 31, 2019 and June 30, 2019[,]" and advising that "[i]nvestors should no longer rely upon the Company's previously released financial statements [and related press releases, earnings releases, and investor communications describing the Company's financial statements] for the time periods cited above."  This press release further stated that "certain revenues recognized during 2018 and 2019 should not have been recorded during that period[,] . . . [and that] certain customer transactions, the Company may have prematurely or inaccurately recognized revenue."

---

[20] The shares of common stock and accompanying purchase warrants were sold together at a combined public offering price of $1.76 per unit, and the pre-funded warrants and accompanying purchase warrants were sold at a public offering price of $1.75 per unit with an exercise price of $0.01 per unit. The pre-funded warrants were immediately exercisable and could be exercised at any time until all of the pre-funded warrants were exercised in full. The Series A Purchase Warrants were exercisable six months after issuance, had an exercise price of $2.25 per share, and were exercisable for 5 years. The Series B Purchase Warrants were exercisable 6 months after issuance, had an exercise price of $1.84 each, and were exercisable for 18 months.

160.    This October 21, 2019 press release provided that Pareteum "estimates the revenue impact for the full year 2018 to be a reduction of approximately $9 million. . . .[and] a reduction of approximately $24 million [for the first half of 2019]."

161.    Following this announcement, shares of Pareteum tumbled in after-market trading, closing at $0.73/share on October 21, 2019 and opening at $0.37/share on October 22, 2019.

## CAUSATION AND ECONOMIC LOSS

162.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Pareteum's stock price and operated as a fraud or deceit on Class Period purchasers of Pareteum's stock by misrepresenting the Company's financial results. Over a period of approximately twenty-three months, Defendants improperly inflated the Company's financial results.  Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, shares of Pareteum declined precipitously - evidence that the prior artificial inflation in the price of Pareteum's shares was eradicated.  As a result of their purchases of Pareteum stock during the Class Period, Plaintiff and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

163.    By improperly characterizing the Company's financial results and misrepresenting its prospects, the Defendants presented a misleading image of Pareteum's business and future growth prospects.  During the Class Period, Defendants repeatedly emphasized the ability of the Company to engage in hyper-inflated market growth while at the same time maintaining rational economic discipline and vetting prospective clients so as to reasonably assure that the hundreds of millions of dollars in Backlog revenue was reasonably assured of being collected, and was not just inflated projections of foreseeably unlikely to be collected revenues from incapable counter-

parties.  These claims caused and maintained the artificial inflation in Pareteum's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

164.    Defendants' false and materially misleading statements had the intended effect of causing Pareteum's shares to trade at artificially inflated levels throughout the Class Period - reaching a Class Period high of $5.93 per share in mid-March 2019.

165.    In June 2019, however, as investors began to learn the truth about the Company, and after the Aurelius Report and Viceroy Reports were published and investors learned that Defendants had failed to report the Company's true financial and operational results, shares of Pareteum collapsed. Finally, on October 22, 2019, Pareteum shares reached a 52-week low following the Company's disclosure that certain revenues for 2018 and 2019 should not have been recorded.  These belated disclosures had an immediate, adverse impact on the price of Pareteum shares.

166.    These belated revelations also evidenced Defendants' prior falsification of Pareteum's business prospects due to Defendants' false statements.  As investors and the market ultimately learned, the Company's prior business prospects and purported Backlog had been inflated and overstated, as were the Company's results of operations.  As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Pareteum's share price, and investors were damaged as a result of the associated decline in the Company's share price.

167.    As a direct result of investors learning the truth about the Company on June 7, 2019 and on June 26, 2019, Pareteum's stock price collapsed approximately 50%, from a close of $4.00 per share to approximately $2.00 per share -- on very high trading volume of over 50 million shares

traded.  Thereafter, on October 22, 2019, shares again collapsed closing at $0.2992 /share with trade volume of over 31.8 million shares. These dramatic declines eradicated much of the artificial inflation of Pareteum's share price and caused real economic loss to investors who purchased this stock during the Class Period.

168.    The decline in Pareteum's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of Pareteum's stock price decline negates any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.  During the same period in which Pareteum's share price fell as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

169.    The economic loss, *i.e.*, damages suffered by Plaintiff and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Pareteum's stock and the subsequent significant decline in the value of the Company's shares when Defendants' prior misstatements and other fraudulent conduct were revealed. The dramatic decline in the price of Company shares immediately following Defendants' October 21, 2019 belated disclosure is evidenced, in part, by the chart below:



## VIOLATIONS OF GAAP AND SEC REPORTING RULES

170.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

171.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

172.    SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

173.    In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided.  Instructions to Item 303 require that this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. . .

174.    The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28.  Paragraph 17 of this authoritative pronouncement states that:

The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

175.    The Company's financial statements contained in the quarterly 2018 reports, full-year 2018 reports, and quarterly 2019 reports filed with the SEC on Form 10-K and Form 10-Q for the periods throughout the Class Period, were presented in a manner that violated the principle of fair financial reporting and the following GAAP, among others:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)    The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)    The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)    The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(g)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(h)     The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

176.     In addition, during the Class Period, Defendants violated SEC disclosure rules:

(a)     Defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. § 229.303), and that failure to disclose the information rendered the statements that were made during the Class Period materially false and misleading; and

(b)     by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. § 210.4-01(a)(1).

177.     Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP.  The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP.  Defendants knew, or were reckless in not knowing, the facts which indicated that all of the Company's interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set forth herein.  Had the true financial position and results of operations of the

Company been disclosed during the Class period, the Company's common stock would have traded at prices well below that which it did.

## ADDITIONAL SCIENTER ALLEGATIONS

178.    As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Pareteum, their control over, and/or receipt and/or modification of Pareteum's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Pareteum, participated in the fraudulent scheme alleged herein.

179.    Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company in order to: (i) deceive the investing public regarding Pareteum's business, operations, management and the intrinsic value of Pareteum common stock; (ii) enable defendants to artificially inflate the price of Pareteum shares; (iii) enable Pareteum insiders to use at least $30 million of Company stock as currency to acquire revenues, and it enabled them to raise at least $50 million in capital necessary to fund operations, while in possession of material adverse non-public information about the Company; and (iv) cause Plaintiff and other members of the Class to purchase Pareteum common stock at artificially inflated prices.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

180.    At all relevant times, the market for Pareteum's common stock was an efficient market for the following reasons, among others:

(a)    Pareteum's stock met the requirements for listing, and was listed and actively traded on the Nasdaq national market exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Pareteum filed periodic public reports with the SEC and the Nasdaq;

(c)    Pareteum regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other media; and

(d)    Pareteum was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

181.    As a result of the foregoing, the market for Pareteum securities promptly digested current information regarding Pareteum from all publicly available sources and reflected such information in Pareteum stock price. Under these circumstances, all purchasers of Pareteum common stock during the Class Period suffered similar injury through their purchase of Pareteum common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

182.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

77

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Pareteum who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

183.    Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of SEC filings by Pareteum, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

184.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

185.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public regarding Pareteum's business, operations, management and the intrinsic value of Pareteum common stock; (ii) enable Defendants to artificially inflate the price of Pareteum shares; (iii) enable Pareteum insiders to use at least $30 million of Company stock as currency to acquire revenues, and it enabled the Company to raise at least $50 million in capital necessary to fund operations, while in possession of material adverse non-public information about the Company; and (iv) caused Plaintiff and other members of the Class to purchase Pareteum common stock at artificially inflated prices.

186.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Pareteum's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

187.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Pareteum as specified herein.

188.    These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Pareteum's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to

make the statements made about Pareteum and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Pareteum common stock during the Class Period.

189.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

190.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.    Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing Pareteum's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.    As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and earnings throughout the Class

Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

191.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Pareteum common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Pareteum's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Pareteum common stock during the Class Period at artificially high prices and were damaged.

192.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Pareteum was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Pareteum common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

193.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

194.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

**Violation Of Section 20(a) Of
The Exchange Act Against Individual Defendants
(Turner, O'Donnell, Bozzo, and McCarthy)**

195.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

196.     The Individual Defendants acted as controlling persons of Pareteum within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

197.     In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had

the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

198.    As set forth above, Pareteum and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 24, 2019                    Respectfully submitted,


                                           */s/ Melinda A. Nicholson*_____
                                           LEWIS S. KAHN
                                           MELINDA A. NICHOLSON (MN-6251)
                                           MICHAEL J. PALESTINA
                                           **KAHN SWICK & FOTI, LLC**
                                           1100 Poydras Street – Suite 3200
                                           New Orleans, Louisiana 70163
                                           Telephone: (504) 455-1400
                                           Facsimile: (504) 455-1498
                                           Email: Lewis.Kahn@ksfcounsel.com
                                           Email: Melinda.Nicholson@ksfcounsel.com
                                           Email: Michael.Palestina@ksfcounsel.com

                                           -and-

                                           J. RYAN LOPATKA
                                           **KAHN SWICK & FOTI, LLC**
                                           250 Park Ave., Suite 2040
                                           New York, NY 10177
                                           Telephone: (212) 696-3730
                                           Facsimile: (504) 455-1498
                                           Email: kim.miller@ksfcounsel.com


                                           ***Attorneys for Plaintiff***